COMPUTER CORPORATION OF AMERICA vs. WILLIAM ZARECOR
& another.[1]

Middlesex.   May 13, 1983. — August 1, 1983.

Present: PERRETTA, CUTTER, & SMITH, JJ.

*Arbitration*, Parties.  *Contract*, Parties.  *Practice, Civil*, Admission.  *Corporation*, Promoter.

In an action by a corporation seeking to impose liability upon two individuals on, or by reason of, a contract they had negotiated with the plaintiff corporation on behalf of a purported corporation which allegedly had never been organized, a judge correctly denied a motion by one of the defendants to invoke the compulsory arbitration provision of the contract, where the contract gave no clear indication that this defendant, who had signed the contract as the purported corporation's president, was to be considered a party to the contract for this purpose [459-461], and where the judge appropriately might have concluded that, in light of the defendants' conduct in repudiating the contract, neither was entitled to the benefit of its compulsory arbitration provision [461-462].

CIVIL ACTION commenced in the Superior Court Department on December 18, 1981.

A motion to compel arbitration was heard by *Zobel*, J.

*Linda A. Serafini* for Arthur B. Copeland.

*Donald R. Ware* (*Toni G. Wolfman* with him) for the plaintiff.

CUTTER, J.   The plaintiff (CCA), a Massachusetts corporation, develops and sells computer software products in Cambridge.  On March 17, 1981, it made a contract with a purported entity, European Market Consultants, Inc. (EMC), by which it granted to EMC an exclusive license to distribute in France and West Germany a product known as the Model 204 Database Management System (the System).

[1] Arthur B. Copeland.

The contract had been negotiated for EMC for some months by the defendant Copeland (see n. 1) and (perhaps to a lesser extent) by the defendant Zarecor and one Nouveau. EMC was described in the contract as "a Virginia corporation with a principal place of business in Fairfax, Virginia ('Licensee')."

The contract stated that "CCA and Licensee agree as follows:" and provided among other matters that EMC would pay to CCA an initial license fee of $408,000 during the first year, to be secured by a bank letter of credit in that amount. It also contained (art. 17) the arbitration provision set out in the margin.[2] Article 18(b) stated that the "Agreement shall be binding upon, and inure to the benefit of, *CCA and Licensee* and their respective legal representatives, successors and permitted assigns" (emphasis supplied), and that the "agreement is personal to Licensee." The contract, art. 18(c), was to "be governed by, and construed and enforced in accordance with, the substantive law of . . . Massachusetts." The contract was executed in the respective corporate names of CCA, by its vice president for finance, and of EMC by Copeland as "president". Zarecor did not sign the contract in any capacity.

CCA, on December 18, 1981, filed the complaint in this action asserting that Zarecor and Copeland acting together as joint venturers, "each . . . on behalf of the other . . . and

---

[2] "17. *ARBITRATION* (a) All disputes . . . which may arise *between the parties hereto* out of or *in relation to or in connection with* this Agreement, shall be finally settled by arbitration in Boston, . . . in accordance with the Commercial Arbitration Rules then in effect of the American Arbitration Association. The decision of such arbitration shall be binding on *both parties*, and a judgment on an award rendered shall be entered pursuant to paragraph (b) . . . .

"(b) Exclusive jurisdiction . . . over entry of judgment on any arbitration award rendered pursuant to paragraph (a) . . . or over any dispute, action or suit arising therefrom shall be in any court of appropriate subject matter jurisdiction located in . . . Massachusetts, and *the parties* by this Agreement expressly subject themselves to the personal jurisdiction of said court for the entry of any such judgment and for the resolution of any dispute, action, or suit arising in connection with the entry of such judgment" (emphasis supplied).

of the joint venture," had approached CCA about an exclusive license of the System of the type later covered by the contract. The complaint alleged, on information and belief, that EMC had never been formed or capitalized or, if capitalized, its assets had been withdrawn. The complaint also contained (among others) the further allegations summarized in the margin.[3]

The complaint contained six counts asserting various theories on which CCA contends that Zarecor and Copeland are liable to CCA for the initial license fee. Count I alleged that these defendants, "as promoters of EMC," were liable for the performance of the contract. Count II alleged that in "furtherance of . . . [the] joint venture" the defendants "entered into the [a]greement with CCA and assumed the obligations set forth therein" and that they are liable for all damages which CCA has suffered "as a result of their breaches of contract." The allegations of the complaint were in general (a) denied by each defendant (represented by the same counsel) or (b) asserted to be outside the particular defendant's knowledge. Each answer raised as a ninth defense that, under the contract, the claims for relief were "to be settled by arbitration." Various affidavits were filed by the parties which tended to establish the facts essentially as set out above.[4]

---

[3] Background allegations of the complaint included those set out below. Zarecor and Copeland represented that they had formed a corporation, capitalized by Zarecor to the extent of $100,000. As an inducement to CCA to enter into a licensing agreement, Zarecor promised to supply to CCA an irrevocable letter of credit to secure a guaranteed minimum payment for the license. The contract of March 17, 1981, was executed by Copeland "with the knowledge and authorization of . . . Zarecor." No letter of credit was ever delivered to CCA, despite representations by Zarecor after March 17, 1981, that he would pledge his own assets to obtain such a letter of credit. On September 4, 1981, CCA was notified by, or in behalf of, the defendants that EMC had been "dissolved" and that CCA would be furnished a telephone explanation. On September 16, 1981, CCA notified the defendants that it intended to hold EMC accountable for the guaranteed initial license fee.

[4] Zarecor filed a motion to dismiss the complaint under Mass.R.Civ.P. 12(b)(2), 365 Mass. 755 (1974), on the ground that the Superior Court

The issues before us arise from the motion judge's denial (April 30, 1982) of a motion by Copeland filed April 22, 1982, to compel CCA to arbitrate (under the arbitration provision, see note 2, *supra*) its claims against Copeland and to stay the entire litigation related to the contract of March 17, 1981. The motion judge filed no memorandum of his reasons for denying this motion. The motion judge also denied a motion for reconsideration of his refusal to order CCA to arbitrate the claims. From these denials Copeland appealed. Zarecor never asked for arbitration under the arbitration provision (see note 2, *supra*) of the contract of March 17, 1981. See, however, the ninth defense asserted in his answer, *supra*. He has not appealed from any action of the trial judge, including the denial of Copeland's motion to order arbitration, nor has he filed any brief.

1. The Massachusetts courts have enforced arbitration provisions in contracts "as broadly as the *parties* obviously intended" (emphasis supplied). See *Glenn Acres, Inc.* v. *Cliffwood Corp.*, 353 Mass. 150, 154 (1967); *Quirk* v. *Data Terminal Syss.*, 379 Mass. 762, 765, 767-768 (1980); *Geller* v. *Temple B'nai Abraham*, 11 Mass. App. Ct. 917, 918 (1981). They also have resisted encumbering arbitration proceedings with the incidents of litigation. See *Lawrence* v. *Falzarano*, 380 Mass. 18, 27-29 (1980); *Floors, Inc.* v. *B.G. Danis of New England, Inc.*, 380 Mass. 91, 96 et seq. (1980). The requirement of resort to arbitration, however, seems to have been confined to those who have agreed to it in advance.

For Copeland to force CCA to arbitrate a dispute with respect to a contract containing an arbitration agreement, he must show that he is a party to that contract. See G. L. c. 251, § 1 ("any controversy . . . arising between the *parties*") and § 2(a), authorizing "an order directing the *parties* to proceed to arbitration" (emphasis supplied), each as in-

lacked jurisdiction over him. This was heard and denied by a motion judge (who filed a statement of his reasons). Zarecor claimed no appeal from this order and no issue concerning it is before us. Zarecor subsequently filed his answer mentioned above.

serted by St. 1960, c. 374, § 1. See the comprehensive review of the authorities in *Danvers* v. *Wexler Constr. Co.*, 12 Mass. App. Ct. 160, 162-168 (1981), especially at 163. There it was recognized that, although an agreement to arbitrate "'should be construed as broadly as . . . was intended,'" apparently only "the *parties* are deemed to have consented in advance to arbitrate any dispute which they cannot settle" (emphasis supplied). See also *Greenleaf Engr. & Constr. Co.* v. *Teradyne, Inc.*, 15 Mass. App. Ct. 571, 573-574 (1983); *Engine Specialties, Inc.* v. *Bombardier Ltd.*, 454 F.2d 527, 531 (1st Cir. 1972).

Various provisions of the contract of March 17, 1981, summarized above, point strongly to the conclusion that neither CCA, on the one hand, nor the individual defendants, on the other hand, intended that Copeland and Zarecor should be "parties" to the contract. There is no clear indication that they, or either of them, were intended to be able to invoke arbitration as "parties." See *Interocean Shipping Co.* v. *National Shipping & Trading Corp.*, 462 F.2d 673, 677-678 (2d Cir. 1972); *S. C.* 523 F.2d 527, 538 (1975), cert. denied, 423 U.S. 1054 (1976).[5] Compare *Kearsarge Metallurgical Corp.* v. *Peerless Ins. Co.*, 383 Mass. 162, 166-168 (1981). In any event under G. L. c. 251, § 2(*a*)

---

[5] In various circumstances and on different theories, a promoter of a corporation to be formed may be held liable upon, or entitled to the benefits of, a contract made in the name of, or for the benefit of, that corporation. See *Reuter* v. *Ballard,* 267 Mass. 557, 562 (1929, "if the projected corporation could not be bound . . . it was intended and understood that the . . . [promoter] should be bound individually"); *Hushion* v. *McBride,* 296 Mass. 4, 7 (1936, "wholly unborn corporation could not be bound by a prenatal contract"); *Productora e Importadora de Papel, S.A. de C.V.* v. *Fleming,* 376 Mass. 826, 835-837 (1978). See also *Abbott* v. *Hapgood,* 150 Mass. 248, 252 (1889); *Dunning* v. *Bates,* 186 Mass. 123, 125 (1904); *Mansfield* v. *Lang,* 293 Mass. 386, 390-391 (1936, evidence did not "suggest that the plaintiff was looking to the proposed corporation and not to" its proposed controlling shareholder "for carrying out the agreement"); 2 Williston, Contracts § 306, at 423-424 (3d ed. 1959 & 1983 supp.). Compare *First Natl. Bank* v. *Jefferson Mortgage Co.,* 576 F.2d 479, 490 (3d Cir. 1978, breach of implied warranty of authority); Restatement (Second) of Agency § 329 comment j (1957); Note, 53 Harv.L.Rev. 1042 (1940).

and (*b*), the issue of the existence of an agreement to arbitrate is to be determined "summarily" by a judge of the Superior Court and this has been done by the court which is charged with that duty.

2. The individual defendants each deny the allegations of CCA's complaint which allege that they are liable to CCA on (or by reason of) the contract of March 17, 1981. Thus, even if it had been intended that they should be "parties" to that contract, they certainly could be found by their answers and conduct to have repudiated and abandoned the contract in a casual manner wholly inconsistent with Copeland's present position. The defendants never rendered any services under that contract. The motion judge would not have been clearly in error in concluding that Copeland, because of his conduct, was not entitled in any event to enforce arbitration under article 17. See *Mendez* v. *Trustees of Boston Univ.*, 362 Mass. 353, 356-357 (1972). See also *E. I. Dupont de Nemours & Co.* v. *Lyles & Lang Constr. Co.*, 219 F.2d 328, 334 (4th Cir.), cert. denied, 349 U.S. 956 (1955). Compare *Riess* v. *Murchison*, 384 F.2d 727, 731-734 (9th Cir. 1967); *Hilti, Inc.* v. *Oldach*, 392 F.2d 368, 370-371 (1st Cir. 1968).[6]

One further practical consideration supports the motion judge's action. We perceive no interest of judicial economy which would be served by compelling CCA to arbitrate its claims against Copeland while permitting this litigation to proceed against Zarecor. With all the uncertainties which exist concerning whether Zarecor could be compelled to engage in an arbitration of CCA's claims against him and Copeland, we think that the motion judge correctly exercised whatever discretion he possessed to permit CCA to continue (without any problems which might beset it in arbi-

---

[6] Zarecor has not sought arbitration (except, perhaps, by asserting it as a defense in his answer, see *Hilti, Inc.* v. *Oldach*, 392 F.2d at 371). Even if he had done so, his assertion would be subject to the same considerations as those which affect Copeland mentioned in the text of this opinion. For special considerations relating to multiparty arbitrations, see *Stop & Shop Cos.* v. *Gilbane Bldg. Co.*, 364 Mass. 325, 327-330 (1973).

tration) its action against the defendants, at best very doubtfully to be regarded as parties to the contract of March 17, 1981. He properly could give consideration to increased obstructive delay and expense likely to follow any other decision.

Copeland contends that CCA by its complaint has asserted that he and Zarecor are bound by the contract of March 17, 1981, and has thus recognized them as parties. See Liacos, Massachusetts Evidence 5 (5th ed. 1981). We think in the circumstances that the allegations of the complaint, asserting the theories of liability mentioned above in n.5 with respect to the contract, are not so specific as to constitute admissions which must be held binding on CCA.

3. Of course, if CCA and each of the defendants should now agree to submit all their disputes to arbitration (as an economical method of dealing with a complicated controversy), this may be done. In the circumstances shown by the record, however, this litigation may continue.

*Order denying motion to
compel arbitration affirmed.*