CHARLES MILLER, JR., personal representative,[1] vs. ERIC
COTTER & others.[2]

Worcester. February 6, 2007. - March 30, 2007.

Present: GREANEY, IRELAND, SPINA, & CORDY, JJ.

*Arbitration. Contract,* Arbitration. *Uniform Arbitration Act. Nursing Home.*

Discussion of the Federal and State statutory frameworks concerning arbitration, and the principle that the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. (2000), does not preempt the Massachusetts Arbitration Act, G. L. c. 251, because the latter does not seek to limit the enforceability of arbitration contracts. [676-679]

This court concluded that the plain language of the Massachusetts Arbitration Act, G. L. c. 251, required the enforcement of a predispute arbitration agreement executed by the plaintiff on behalf of his elderly father (pursuant to a durable power of attorney) as part of the father's admission to a nursing home, where the plaintiff's claim that the agreement was revocable due to unconscionability was not viable, based either on the specific facts of the case, or on the nursing home context in general, given the unambiguous legislative and judicial policy favoring arbitration agreements [679-684]; moreover, principles of judicial economy did not provide adequate grounds to set aside an otherwise valid agreement, even if requiring the plaintiff to arbitrate his claims against the nursing home and its employees, and proceed separately against the physician who examined the plaintiff's father at the nursing home (but who was neither an employee of the nursing home nor a party to the arbitration agreement), would be duplicative [684-686].

CIVIL ACTION commenced in the Superior Court Department on January 13, 2005.

A motion to compel arbitration was heard by *Francis R. Fecteau,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Joseph M. Desmond (Michael Rossi* with him) for the defendants.

*Adam R. Satin* for the plaintiff.

---

[1]Of the estate of Charles Miller, Sr.

[2]Lisa Waller; Tracey Cokonis; Shannon Valera; and Beverly Enterprises-Massachusetts, Inc., doing business as Birchwood Care Center.

The following submitted briefs for amici curiae:

*Steven H. Schafer*, pro se.

*Kenneth A. Behar & Rochelle H. Zapol* for Massachusetts Extended Care Federation, Inc.

CORDY, J. In this case we consider the validity of an arbitration agreement executed in the context of an admission to a nursing home. The plaintiff, Charles Miller, Jr., signed the agreement on behalf of his father as part of his father's admission to Birchwood Care Center (Birchwood) in Fitchburg. Miller's father later died while still a patient at Birchwood. Miller subsequently brought suit against the physician who examined his father at Birchwood (Dr. Eric Cotter); Birchwood; and three Birchwood employees, alleging negligence and wrongful death.

On the basis of the arbitration agreement, Birchwood and its employees (collectively, Birchwood or Birchwood defendants) moved to dismiss the complaint and to compel arbitration. A judge in the Superior Court denied the motion, and Birchwood appealed. Birchwood argues that the judge had no legal basis for declining to enforce the arbitration agreement, and that Federal and State statutes require that it be enforced. We agree and accordingly reverse.[3]

1. *Background.* Miller's father was admitted to Birchwood on October 10, 2003. He was ninety-one years old. The elder Miller had been in a series of hospitals, nursing homes, and psychiatric wards over the previous years. His son had authority to make binding agreements on his behalf pursuant to a validly executed durable power of attorney; the younger Miller also held a valid health care proxy for his father.

On the day of his father's admission to Birchwood, Miller, accompanied by his wife, met with social worker Lynn Wilson, who was employed by Birchwood to help manage patient cases. During the meeting, which lasted between sixty and ninety minutes, Miller and Wilson discussed details relevant to the admission, and Miller signed the necessary forms on his father's behalf. These included a sixteen-page admission agreement[4] and an agreement providing for the binding arbitration of disputes.

---

[3]We acknowledge the briefs of amici curiae Massachusetts Extended Care Foundation, Inc., and Steven H. Schafer.

[4]As part of the admission agreement, Charles Miller, Jr. (Miller), initialed

The arbitration agreement was printed within the admission agreement and was presented as a separate document. Execution was not a condition of admission to Birchwood, and that fact was noted in capital letters at the top of the arbitration agreement. The agreement was printed on two single-spaced pages, with one-half of the second page devoted to signatures. It provided, in relevant part:

> "[T]he Admission Agreement evidences a transaction involving interstate commerce governed by the Federal Arbitration Act. It is understood and agreed by Facility and Resident that any and all claims, disputes, and controversies . . . arising out of, or in connection with, or relating in any way to the Admission Agreement or any service or health care provided by the Facility to the Resident shall be resolved exclusively by binding arbitration . . . in accordance with the National Arbitration Forum Code of Procedure . . . and not by a lawsuit or resort to court process."

The agreement offered further information about arbitration including contact information for the National Arbitration Forum. It also had a provision allowing the admitted resident to rescind the arbitration agreement unilaterally by giving notice within thirty days of execution. Finally, the arbitration agreement did not limit any remedies available under Federal or State law, but stated that the decisions of the arbitrator "shall be determined in accordance with the provisions of the state or federal law applicable to a comparable civil action."

Miller concedes that he was given a copy of all of the agreements he signed, including the arbitration agreement. In his deposition, Miller testified that during the admission meeting, Wilson "summarized" the agreements, explaining to him that the arbitration agreement was not a precondition of admission, and that its purpose was to put disputes before an arbitrator

acknowledgments that he had received printed copies of various documents. These documents included a written explanation of how to apply for and use Medicare, a statement discussing the grievance procedures with State agencies, an explanation of Birchwood's rules and regulations, and a notice of privacy practices.

rather than a court.[5] He further testified that he could not recall any specifics about the provisions of the agreements, and that he did not read through all of their terms, word by word. He also testified that he was under great stress at the time of admission and "just wanted to make sure that there was no problem getting dad admitted."[6] According to Miller, his stress was not caused by "anything the nursing home was doing" but by "the situation with dad."

Miller showed an understanding of contracts and the language used in them during his deposition. He holds a degree in English from Tufts University and served as an intelligence officer in the United States Air Force. After leaving the military, Miller spent twenty-seven years in the insurance industry, working as a claims examiner and as a regional claims manager in a variety of divisions of his company (including medical and disability). Because of his work, he had a knowledge of arbitration, and "assume[d]" that his automobile and home insurance policies included arbitration provisions. Miller also showed himself to have an extensive understanding of his rights and responsibilities under both his father's power of attorney and the health care proxy. He had signed admission agreements for his father at several other facilities, and had done the same for his mother. The elder Miller died on November 4, 2003, while still a patient at Birchwood.

*2. Prior proceedings.* Miller filed this action in the Superior Court on January 13, 2005. The complaint alleged negligence; wilful, wanton, and reckless conduct; and failure to obtain informed consent against both Cotter and the Birchwood defendants. It sought to recover for conscious suffering and wrongful death. The Birchwood defendants filed their answer on April 15, 2005, generally denying the allegations in the complaint and setting up various defenses, including the agreement to submit any dispute to binding arbitration.[7]

The Birchwood defendants then filed a motion to dismiss, or

---

[5]In her deposition, Wilson testified that Miller "looked at [the arbitration agreement]" after she had summarized it, but conceded that she had not read it to him "word-for-word."

[6]At the time of the meeting, Miller's father was already in a bed at Birchwood.

[7]The Birchwood defendants' answer also included a cross claim against

in the alternative to stay proceedings pending arbitration.[8] Because Cotter was neither an employee of Birchwood nor a party to the arbitration agreement, he did not join in this motion. The motion judge allowed a stay of ninety days to permit the parties to conduct discovery limited to the enforceability of the arbitration agreement. Thereafter, each party filed a written memorandum in support of its position and the motion judge heard oral argument on October 12, 2005.

The judge denied the motion without written opinion.[9] His order read:

> "This motion is DENIED after hearing and upon consideration of the arguments of the parties, I find that to require the plaintiff to arbitrate some part of this claim against the moving party, but not all claims or parties results in an inequitable, [inefficient] and unnecessarily expensive duplication of effort that renders enforcement of this arbitration agreement to be [substantively] and procedurally unfair."

The Birchwood defendants then appealed under G. L. c. 251, § 18 (*a*) (1), which grants a right of interlocutory appeal from orders denying an application to compel arbitration.[10] We transferred the case here on our own motion.

3. *Discussion.* The Birchwood defendants argue that it was an error of law for the judge to deny their motion to dismiss and to compel arbitration. They cite in support the Federal and Massachusetts Arbitration Acts, claiming that under those Acts a court may only set aside an arbitration agreement for fraud, duress, or unconscionability, none of which is present here. The

---

Cotter for contribution and indemnification.

[8]On October 14, 2005, a medical malpractice tribunal reported that there was sufficient evidence to raise a question of liability appropriate for judicial inquiry as to Cotter and as to all of the Birchwood defendants.

[9]The lack of a written opinion has hindered our review because we have no basis for understanding the factual underpinnings of the judge's legal conclusions.

[10]The arbitration contract, and therefore the motion to compel arbitration, only implicated the claims against the Birchwood defendants. Therefore, although Cotter is the named defendant here, Miller's claims against him are not before us. All proceedings in the Superior Court, including those against Cotter, have been stayed pending this appeal.

Birchwood defendants argue further that the judge committed reversible error when, citing judicial convenience, he relied on the existence of a claim against Cotter, who was not a party to the arbitration agreement, to defeat the agreement as between Miller and the Birchwood defendants. We address these arguments in turn.[11]

a. *Standard of review.* The judge correctly treated the Birchwood defendants' motion to compel arbitration as one for summary judgment. See G. L. c. 251, § 2 (a) (judge shall proceed summarily to determine existence of arbitration agreement). We review a grant of summary judgment de novo, construing all facts in favor of the nonmoving party.[12] *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991).

b. *Statutory framework.* The Massachusetts Arbitration Act, St. 1960, c. 374, § 1, codified, as amended, at G. L. c. 251 (Massachusetts Act), is this Commonwealth's version of the Uniform Arbitration Act. The Massachusetts Act "expresses a strong public policy favoring arbitration as an expeditious alternative to litigation for settling commercial disputes." *Home Gas Corp. of Mass., Inc.* v. *Walter's of Hadley, Inc.*, 403 Mass. 772, 774 (1989), quoting *Danvers* v. *Wexler Constr. Co.*, 12 Mass. App. Ct. 160, 163 (1981). It provides in part:

"A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit

---

[11]The text of the order seems to conflate what are, in fact, two distinct bases for the judge's conclusion: the procedural and substantive fairness of the contract, and the fairness of dividing the judicial proceedings. The parties properly briefed these questions separately, and we treat them likewise.

[12]Citing *Computer Corp. of Am.* v. *Zarecor*, 16 Mass. App. Ct. 456, 461-462 (1983) (*Zarecor*), and *Hague* v. *Piva*, 61 Mass. App. Ct. 223, 229 (2004) (*Hague*), Miller suggests that a judge's decision not to compel arbitration should be reviewed for abuse of discretion or clear error. Neither case stands for that proposition. In *Zarecor*, *supra* at 459-461, the relevant question was whether the litigants were parties to the contract able to enforce its arbitration provision. That question was reviewed de novo as a question of law. The *Hague* case involved a judge's review of a challenged arbitration award. The judge had vacated the award because he determined that the arbitrator had refused to hear evidence material to the controversy. Only that determination, that material evidence had been excluded, was reviewed for abuse of discretion. See *Hague*, *supra* at 226-228. It had nothing to do with a review of the order to compel arbitration.

to arbitration any controversy thereafter arising between
the parties shall be valid, enforceable and irrevocable, save
upon such grounds as exist at law or in equity for the
revocation of any contract."

G. L. c. 251, § 1 (validity of arbitration agreement). The Mas-
sachusetts Act also allows for proceedings in the Superior Court
to compel arbitration in accordance with the terms of an arbitra-
tion agreement, and permits an interlocutory appeal from orders
denying an application to compel arbitration. See G. L. c. 251,
§§ 2, 18.

The Federal government had enacted a similar statute, the
Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. (2000) (Federal
Act). Its language is remarkably similar to that of the Mas-
sachusetts Act:

> "A written provision in any maritime transaction or a
> contract evidencing a transaction involving interstate com-
> merce to settle by arbitration a controversy thereafter aris-
> ing out of such contract or transaction or the refusal to
> perform the whole or any part thereof, or an agreement in
> writing to submit to arbitration an existing controversy
> arising out of such a contract, transaction, or refusal, shall
> be valid, irrevocable, and enforceable, save upon such
> grounds as exist at law or in equity for the revocation of
> any contract."

Federal Act, *supra* at § 2. This language, according to the
United States Supreme Court, declares a Federal policy favor-
ing arbitration. *Mastrobuono* v. *Shearson Lehman Hutton, Inc.*,
514 U.S. 52, 62 (1995). As a result of this policy, the language
of the Federal Act is to be interpreted broadly, "consistent with
[its] basic purpose, to put arbitration provisions on 'the same
footing' as a contract's other terms." *Allied-Bruce Terminix
Cos.* v. *Dobson*, 513 U.S. 265, 275 (1995), quoting *Scherk* v.
*Alberto-Culver Co.*, 417 U.S. 506, 511 (1974). Only generally
applicable contract defenses, such as fraud, duress, or uncon-
scionability, can be used to invalidate arbitration provisions or
agreements contemplated under the Federal Act. *Doctor's
Assocs., Inc.* v. *Casarotto*, 517 U.S. 681, 687 (1996). Where the
Federal Act applies, it prohibits singling out arbitration provi-
sions for suspect status under State law. *Id.*,

The Massachusetts Act applies here by its plain terms. Insofar as the arbitration agreement is a "contract evidencing a transaction involving commerce," the Federal Act would also apply. Federal Act, *supra* at § 2. Congress's commerce power is interpreted broadly, and " 'may be exercised in individual cases without showing any specific effect upon interstate commerce' if in the aggregate the economic activity in question would represent 'a general practice . . . subject to federal control.' " *Citizens Bank* v. *Alafabco, Inc.*, 539 U.S. 52, 56-57 (2003), quoting *Mandeville Island Farms, Inc.* v. *American Crystal Sugar Co.*, 334 U.S. 219, 236 (1948). Healthcare is such an activity. See, e.g., *Summit Health, Ltd.* v. *Pinhas*, 500 U.S. 322, 329 (1991) (hospital's purchase of out-of-State medicines and acceptance of out-of-State insurance establish interstate commerce). In addition, and more specifically, accepting payment from Medicare, a Federal program (which there was some evidence of here), constitutes an act in interstate commerce. *Id.* at 327.[13]

We apply the Massachusetts Act in this case, although we do so cognizant that the Federal Act almost certainly applies as well. Deciding this case based on Massachusetts rather than Federal law does not, however, create a preemption problem because "even when federal law applies to an arbitration agreement, the [Federal Act] has never been construed to preempt all state law on arbitration." *New England Energy Inc.* v. *Keystone Shipping Co.*, 855 F.2d 1, 4 (1st Cir.), cert. denied, 489 U.S. 1077 (1989). Only those State acts that seek to limit the enforce-

---

[13]In addition to their interstate commerce argument, the Birchwood defendants also claim that the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. (2000) (Federal Act), applies because the parties agreed it would by the terms of the contract itself. We reject this argument for two reasons. First, it presumes the conclusion that is at issue here: whether the arbitration agreement (including its term that the Federal Act applies) is enforceable. Second, the Federal Act applies when Congress's commerce power is implicated. Determining when that is so depends on the broad constitutional limits of what constitutes an act in interstate commerce. The parties cannot by agreement make an act not in interstate commerce into one that is in interstate commerce. They can, however, agree that the Federal Act will provide the basis for interpreting the contract, even if the Federal Act would not otherwise apply in a binding way on a State court. Applying the Federal Act as an interpretive guide would only apply once the agreement is deemed valid and enforceable.

ability of arbitration contracts are preempted by the Federal Act. "None of the various preemption standards suggests that Congress intended the federal Act to supersede all state arbitration law . . . ." *Id.* at 4-5. This is particularly so where, as with the Massachusetts Act and the Federal Act, the State and Federal laws serve the same purpose. See *Baxter Health Care, Corp.* v. *Harvard Apparatus, Inc.*, 35 Mass. App. Ct. 204, 205 n.1 (1993) (discussing compatible purposes of Federal Act and Massachusetts Act). In any event, unless there is clear reason to do otherwise, we interpret cognate provisions of State and Federal law similarly. See, e.g., *Mammone* v. *President & Fellows of Harvard College*, 446 Mass. 657, 679 (2006) (discrimination statutes); *Andover Hous. Auth.* v. *Shkolnik*, 443 Mass. 300, 306 (2005) (housing law).

The plain language of the Massachusetts Act requires that an arbitration agreement "shall be valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract" G. L. c. 251, § 1. Cf. Federal Act, *supra* at § 2 (same). These grounds include fraud, duress, or unconscionability. See *Doctor's Assocs., Inc.* v. *Casarotto*, *supra* at 687. Only unconscionability is at issue here. This doctrine has long been recognized as grounds for avoiding a contract. Historically, a contract was considered unconscionable if it was "such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other." *Hume* v. *United States*, 132 U.S. 406, 411 (1889), quoting *Earl of Chesterfield* v. *Janssen*, 28 Eng. Rep. 82, 100 (Ch. 1750). "Later, a contract was determined unenforceable because unconscionable when 'the sum total of its provisions drives too hard a bargain for a court of conscience to assist.' " *Waters* v. *Min Ltd.*, 412 Mass. 64, 66 (1992), quoting *Covich* v. *Chambers*, 8 Mass. App. Ct. 740, 750 n.13 (1979).

"The determination that a contract or term is or is not unconscionable is made in the light of its setting, purpose and effect." Restatement (Second) of Contracts § 208 comment a (1981). "Because there is no clear, all-purpose definition of 'unconscionable,' nor could there be, unconscionability must be determined on a case by case basis (see *Commonwealth* v.

*Gustafsson,* 370 Mass. 181, 187 [1976]), giving particular attention to whether, *at the time of the execution of the agreement,* the contract provision could result in unfair surprise and was oppressive to the allegedly disadvantaged party" (emphasis added). *Zapatha* v. *Dairy Mart, Inc.,* 381 Mass. 284, 292-293 (1980). Considering the "setting, purpose and effect" of the arbitration agreement here, we conclude that it was not unconscionable.

Nothing in the setting of its execution suggests that the agreement was procedurally unconscionable. Miller is an intelligent and educated man whose professional experience gave him sophistication in dealing with contracts. The process of admitting his father to a nursing home was not new to him. Miller was not required to sign the agreement as a condition of admission, and Wilson did not exert any undue pressure on him to sign it. His failure to read the agreement "word-for-word" makes no difference, as we have long held that, absent fraud, a party's failure to read or understand a contract provision does not free him from its obligations. See *Wilkisius* v. *Sheehan,* 258 Mass. 240, 243 (1927); *Grace* v. *Adams,* 100 Mass. 505, 507 (1868).

Similarly, nothing in the terms of the agreement — its "purpose and effect" — suggests that it was substantively unconscionable. The purpose of submitting disputes to binding arbitration is heavily favored by statute and by case law. See G. L. c. 251, § 1; *Home Gas Corp. of Mass., Inc.* v. *Walter's of Hadley, Inc.,* 403 Mass. 772, 774 (1979) (Massachusetts policy favoring arbitration). See also *Mastrobuono* v. *Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 62 (1995) (Federal policy favoring arbitration); Federal Act, *supra* at § 2. The agreement was bilateral in that either party could invoke its provisions. All rights and remedies available in the courts were preserved for the arbitrator, and Miller had a unilateral right of recision for thirty days after execution of the agreement. On this record, there is no viable claim of unconscionability.

Miller urges on us several cases from intermediate appellate courts in other jurisdictions that have held nursing home arbitration contracts unenforceable. In *Small* v. *HCF of Perrysburg,*

*Inc.*, 159 Ohio App. Ct. 66, 68-69 (2004) (*Small*), a sixty-nine year old woman holding a health care proxy for her husband signed an admission agreement on his behalf at a nursing home. The agreement contained an arbitration clause. The husband arrived at the nursing home in a semiconscious state and was soon transported to a hospital. Later, the husband returned to the nursing home, and subsequently died after a fall from a wheelchair. When the widow sued for negligence, the nursing home moved to compel arbitration. The Ohio Court of Common Pleas granted the motion, but the Court of Appeals reversed, citing procedural and substantive unconscionability. *Small, supra* at 72-73. The *Small* court found that the clause had been a condition of admission, and that her husband's acute condition had created overwhelming pressure on her to sign.

In a second case, *Howell* v. *NHC Healthcare-Fort Sanders, Inc.*, 109 S.W.3d 731 (Tenn. Ct. App. 2003) (*Howell*), the court affirmed a trial judge's refusal to enforce an arbitration clause in a nursing home admission agreement. A husband had signed the agreement on his wife's behalf. He was illiterate. The arbitration agreement was a requirement of admission, presented on a "take it or leave it" basis, and the wife was in great need. The court found the agreement substantively unconscionable based on the fact that the arbitration provision did not adequately explain the waiver of jury trial, and that it was "buried" on the tenth page of an eleven-page document, rather than standing alone. *Id.* at 734. As to procedural unconscionability, the court noted that the agreement had not been well described to the husband, and that he had little option but to agree. *Id.* at 735.

We find these cases to be factually distinct from the one before us, and therefore not helpful to Miller's argument.[14] Both *Small* and *Howell* involved arbitration provisions that were part of the admissions agreement. The arbitration agreement in this case was separate from and independent of the admissions agreement, and explicitly not a condition of admission. This

---

[14]We express no opinion as to whether the facts in *Small* v. *HCF of Perrysburg, Inc.*, 159 Ohio App. 3d 66, 68-69 (2004), or *Howell* v. *NHC Healthcare-Fort Sanders, Inc.*, 109 S.W.3d 731 (Tenn. Ct. App. 2003), would constitute unconscionability under Massachusetts law.

was adequately explained in an extended admissions meeting with Miller, a sophisticated and experienced party authorized to sign agreements on his father's behalf.

The Supreme Courts of two States have rejected challenges to arbitration agreements between nursing homes and patients entered into during the admissions process, and prior to any dispute that might arise thereunder. See *Briarcliff Nursing Home* v. *Turcotte*, 894 So. 2d 661 (Ala. 2004) (*Turcotte*), and *Vicksburg Partners, L.P.* v. *Stephens*, 911 So. 2d 507 (Miss. 2005) (*Stephens*). As we do here, these courts found nothing in the circumstances of an ordinary admission to a nursing home that would suggest unfairness or oppression necessary to support a claim of procedural unconscionability. Nor did they find the terms of the arbitration agreements at issue, binding as they were on both parties, to favor one party over another in such a way as to suggest substantive unconscionability. Indeed, in both *Turcotte* and *Stephens*, the arbitration clause was an integral part of the admissions agreement, just as it had been in the *Small* and *Howell* cases. See *Turcotte, supra* at 663; *Stephens, supra* at 510-511.[15] Both the Alabama and Mississippi courts found, as do we, that nursing home admissions were acts in interstate commerce subject to the Federal Act (and its presumption that arbitration agreements should be enforced). *Turcotte, supra* at 668. *Stephens, supra* at 515-516.

Miller also suggests, apart from the facts of any given case, that the context of nursing home admissions is inherently unfair to patients because of the pressures created by the patient's (often acute) need for nursing care, and invites us to adopt a per se rule that predispute arbitration agreements in the nursing home context should be void as a matter of public policy. We decline to adopt such a rule because this type of agreement does not meet the requirements for the public policy exception to the enforcement of contracts. See generally Restatement (Second)

---

[15]While we do not hold here that having the arbitration agreement printed and executed as a separate agreement was necessary to avoid a finding of unconscionability, the separation cuts strongly against Miller's position because it suggests that Birchwood made clear that the arbitration agreement was not a condition of admission.

of Contracts § 178 (1981) (when term is unenforceable on grounds of public policy).

"While courts are hesitant to invalidate contracts on . . . public policy grounds, the public interest in freedom of contract is sometimes outweighed by other public policy considerations; in those cases the contract will not be enforced." *A.Z.* v. *B.Z.*, 431 Mass. 150, 160 (2000) (declining to enforce contract allowing wife to implant preembryos against husband's wishes as contrary to policy allowing party to decide not to become parent), citing *Beacon Hill Civic Ass'n* v. *Ristorante Toscano, Inc.*, 422 Mass. 318, 320-321 (1996) (declining to enforce agreement not to apply for liquor license as contrary to policy of open licensing process). The grounds for a public policy exception must be clear in the acts of the Legislature or the decisions of this court. See *Capazzoli* v. *Holzwasser*, 397 Mass. 158, 160 (1986). As discussed above, the Legislature and the court have expressed a clear policy to the contrary, favoring arbitration. Further, we have found no statutory or regulatory provision that would indicate a particular concern that private disputes between nursing homes and patients should be exempt from the general policy favoring arbitration. Insofar as there is a strong public policy favoring the proper management of nursing facilities, and the provision of quality care to their residents, that policy is firmly imbedded in a regulatory scheme through which complaints and concerns regarding those matters are investigated and remedied by State and Federal administrative agencies. None of these remedies is precluded by the arbitration agreement. To the contrary, the following language of the arbitration agreement clearly preserves them: "this agreement shall not limit the Resident's right to file a grievance or complaint with the Facility or any appropriate government agency, from requesting an inspection from such an agency, or from seeking review under [applicable Federal regulations] of a decision to transfer or discharge the Resident."

In sum, there is nothing in the specific facts of this case, or in the nursing home context in general, that would lead us not to enforce the predispute arbitration agreement between Miller and the Birchwood defendants. This is particularly so given the

unambiguous legislative and judicial policy favoring arbitration agreements.[16]

c. *Judicial economy.* The judge's order denying the motion to compel arbitration stated that, because the arbitration agreement would require Miller to proceed against Dr. Cotter and the Birchwood defendants separately (in court and in arbitration proceedings respectively), it would result in "an inequitable, [inefficient] and unnecessarily expensive duplication of effort." We treat this as reliance on an equitable principle of judicial economy that seeks to avoid forcing parties into duplicative efforts. We find no support for such a principle in case law or in the rules of civil procedure, and do not think it adequate grounds to set aside an otherwise valid agreement.

. In support of his argument that equitable factors are relevant to determining whether to enforce an arbitration agreement, Miller cites *Computer Corp. of Am.* v. *Zarecor,* 16 Mass. App. Ct. 456 (1983) (*Zarecor*). The case does not stand for so broad a principle. The *Zarecor* case involved a dispute between a software company and the promoters of a company that had entered into a licensing agreement with the software company. When the software company sued the promoters (as joint venturers with their company) for the licensing fee, one of the two promoters invoked an arbitration provision in the licensing agreement. *Id.* at 457-459. The issue before the trial judge was whether the promoters were parties to the arbitration agreement

---

[16]We also reject two ancillary grounds Miller offers for nonenforcement of the arbitration agreement. First, Miller claims that the arbitration agreement lacks consideration. This is clearly not so. Each party waived its right to judicial process and gained the right to invoke arbitration. This reciprocal exchange of benefit and detriment constitutes consideration. *Marine Contrs. Co.* v. *Hurley,* 365 Mass. 280, 286 (1974), citing 1 S. Williston, Contracts § 102 (3d ed. 1957) ("The requirement of consideration is satisfied if there is either a benefit to the promisor or a detriment to the promisee"). Second, Miller claims that the arbitration agreement is suspect because it was a contract of adhesion. This is a technically correct description in that the terms of the contract were provided by Birchwood and were not the subject of active negotiation. That label makes no difference, however, because "contracts [of adhesion] are enforceable unless they are unconscionable, offend public policy, or are shown to be unfair in the particular circumstances." *Chase Commercial Corp.* v. *Owen,* 32 Mass. App. Ct. 248, 253 (1992), citing *Lechmere Tire & Sales Co.* v. *Burwick,* 360 Mass. 718, 721 n.3 (1972). We conclude here that the agreement is none of those things.

between the two corporate entities and thus able to invoke the arbitration clause. *Id.* at 459-460.

The Appeals Court affirmed the trial judge's denial of the motion to compel arbitration. After discussing the legal basis of its conclusion, that the promoter was not a party to the arbitration clause and therefore not entitled to invoke it, the Appeals Court stated: "We perceive no interest of judicial economy which would be served by compelling [the software company] to arbitrate its claims against [one promoter] while permitting this litigation to proceed against [the other promoter]." *Zarecor, supra* at 461. This is not, as Miller contends, a reliance on a principle of judicial economy as a basis for upholding a denial of a motion to compel arbitration. Rather, it is an observation, made after the denial had been upheld on other grounds, about the practicalities of ordering arbitration before a final determination whether the party seeking the order even has the right to invoke an arbitration clause. There is no such dispute in this case. It is clear that both Miller and the Birchwood defendants were parties entitled to invoke the arbitration agreement.

The rules of civil procedure also do not supply the principle of judicial economy on which the judge relied. Under the joinder of parties rule, a party "may," as Miller did, join multiple defendants in an action. Mass. R. Civ. P. 20 (a), 365 Mass. 766 (1974). This language is permissive, not mandatory. The same rule also allows for judgment "for one or more of the plaintiffs according to their respective rights to relief, and against one or more of the defendants according to their respective liabilities." *Id.* Such party-appropriate relief may include dismissal and an order to arbitrate. Nothing in the rule grants a plaintiff the right to keep all of his defendants joined if one or more of them has grounds for dismissal. The only situations in which a judge may compel a party's joinder are those where the party is necessary for a just adjudication. Mass. R. Civ. P. 19, 365 Mass. 765 (1974). Miller does not suggest that those conditions are present here.

It is true that, if arbitration is ordered, Miller will be forced to proceed against Cotter in one forum (court) and the Birchwood defendants in another (arbitration). Whether this is inconvenient, duplicative, or inefficient is not determinative. It

is the necessary result of the choice that Miller made when he signed the arbitration agreement.

The order denying the Birchwood defendants' motion to compel arbitration is reversed. The Birchwood defendants are entitled as a matter of law to a judgment dismissing Miller's complaint and compelling arbitration. An order to that effect shall enter in the Superior Court.

*So ordered.*