NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

17-P-1204                                      Appeals Court

   THOMAS R. GLIOTTONE, JR.  vs.  FORD MOTOR COMPANY & others.[1]


No. 17-P-1204.

Norfolk.     September 13, 2018. - July 31, 2019.

Present:  Rubin, Sacks, & Shin, JJ.


Motor Vehicle, Defect, Warranty.  Evidence, Expert opinion.
     Practice, Civil, Summary judgment.  Words, "Lemon law."



     Civil action commenced in the Superior Court Department on July 25, 2014.

     A motion for summary judgment was heard by Angel Kelley Brown, J.; a motion for summary judgment was heard by Rosalind H. Miller, J., and the entry of judgment was ordered by her.


     Christopher M. Lefebvre (Clovis C. Gregor, of Rhode Island, also present) for the plaintiff.
     Michelle I. Schaffer for Ford Motor Company & another.
     Ronald P. Langlois for Tasca Automotive Group, Inc.


     RUBIN, J.  This case requires us to decide whether a

plaintiff suing under the Massachusetts Lemon Law, G. L. c. 90,

§ 7N 1/2, must introduce expert testimony to prove that the

_____
     [1] Tasca Automotive Group, Inc., and Rodman Ford Sales, Inc.

subject vehicle did not comply with the applicable express or implied warranties. A judge of the Superior Court answered this question in the affirmative and on this basis granted summary judgment in favor of defendant Ford Motor Company (Ford).[2] We disagree and therefore, for the reasons set out infra, vacate the judgment entered in favor of all the defendants.

Background. We summarize the facts, many of which are disputed, in the light most favorable to the nonmoving party, here the plaintiff, Thomas R. Gliottone, Jr., in accordance with the traditional standard for summary judgment. See Augat, Inc. v. Liberty Mut. Ins. Co., 410 Mass. 117, 120 (1991). Under that standard, summary judgment is appropriate only when "viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law." Id. Our review of the summary judgment is de novo. See Miller v. Cotter, 448 Mass. 671, 676 (2007).

On July 23, 2010, Gliottone bought a 2010 Ford F-150 pickup truck from defendant Rodman Ford Sales, Inc. (Rodman), an authorized dealer of Ford vehicles located in Foxborough, Massachusetts. The vehicle, manufactured by Ford, came with a

---

[2] The claims against the other defendants also were dismissed as a result of the failure to introduce expert testimony.

limited warranty that covered manufacturing defects. Shortly after the purchase, the truck began exhibiting mechanical problems: the truck would not start, it would stall, it experienced loss of power, and the on-board diagnostic panel would show that it was in "wrench" mode. Gliottone contacted Ford's roadside assistance, which instructed him to bring the vehicle to defendant Tasca Automotive Group, Inc. (Tasca), a different authorized Ford dealer located in Cranston, Rhode Island. He did so on or about August 14, 2010, and Tasca representatives told him that installing a supercharger would solve the mechanical problems and would not adversely affect his warranty. Gliottone agreed to pay for the supercharger, which cost $8,038.68 for parts and labor. The invoice for this service shows that the truck had been driven 1,461 miles and was ready for pickup on September 24, 2010. Ford disputes that the supercharger was an authorized repair, but we are reviewing a motion for summary judgment and there is sufficient evidence to support a finding that it was: the invoice states that the supercharger was installed for "engine repair." Ford also continued to pay for warranty services for problems it blames on the supercharger even though it would have had no obligation to do so under the warranty if the malfunctions were caused by a "modification[]."

According to Gliottone, the vehicle's wrench mode reactivated and the same mechanical problems with failing to start, power loss, and stalling resurfaced in October of 2010. These issues would also occur when the vehicle's "hill descent" and "tow haul" modes were activated. He took the vehicle back to Tasca on October 20, 2010, and the vehicle remained out of service for ten days.[3]

The truck's problems did not end here. It was towed to Tasca on May 16, 2011, apparently through Ford's roadside assistance hotline, because it would crank but not start.[4] By May 19, Tasca had replaced the truck's throttle position sensor and the truck was ready to be picked up.

Gliottone then returned to Tasca on June 1, 2011, because, again, the truck would crank but not start. Tasca kept the truck until June 24 and replaced the fuel pump.

Gliottone again returned to Tasca on August 3, 2011, this time because, when he drove the truck, the hill descent light would illuminate and the truck would lose power. It would also

---

[3] The invoice for this servicing only shows an oil change. The invoice also shows that the truck had a mileage of 1,212, fewer than its mileage more than two months earlier.

[4] The relevant invoice indicates that the vehicle was towed to Tasca, and Gliottone averred that, between September of 2010 and December of 2011, the truck was towed through Ford's roadside assistance "at least three or four times." No other invoice indicates that the truck was towed to that location.

idle "rough." After also discovering problems with the accelerator pedal, Tasca eventually replaced a power control module. The truck was out of service until September 30, 2011.

Another invoice shows that the truck was serviced between November 21, 2011, and December 12, 2011, because the wrench light illuminated and there would be a power loss, precisely the issue that first had plagued the truck. A Tasca mechanic contacted Ford's technical assistance hotline, and was instructed to replace the throttle body, which he did.

Tasca filed claims against Gliottone's warranty with Ford with respect to the throttle position sensor, the fuel pump, the power control module, and the throttle body, but not the supercharger, for which Gliottone paid out-of-pocket.

Tasca removed the supercharger in October of 2011.[5] Although a Tasca invoice shows that one of its mechanics then drove it for 465 miles without issue, Gliottone avers that the initial problems with the vehicle persisted beyond December of 2011, a proposition we must accept on summary judgment review.

---

[5] It is unclear from the record when Gliottone took his vehicle in for this final repair and when it was released. One invoice shows that the relevant repair order was opened on September 29, 2011, after the vehicle had been towed to Tasca, and the truck was ready on January 31, 2012. This is hard to reconcile with an invoice showing that the truck was out of service between August 3, 2011, and September 30, 2011, as well as an invoice showing a different repair order being open between November 21, 2011, and December 12, 2011.

Gliottone then demanded that Ford accept return of the vehicle and give him a refund; Ford declined, and this suit followed.

Analysis. The Lemon Law provides: "If a motor vehicle does not conform to any applicable express or implied warranty, and the consumer reports the nonconformity to the manufacturer of the vehicle, its agent or its authorized dealer during the term of protection, the manufacturer, its agent or its authorized dealer shall effect such repairs as are necessary to conform the vehicle to such warranty." G. L. c. 90, § 7N 1/2 (2). The statute defines "[n]onconformity" to include "any specific or generic defect or malfunction, or any concurrent combination of such defects or malfunctions that substantially impairs the use, market value or safety of a motor vehicle." G. L. c. 90, § 7N 1/2 (1). The "[t]erm of protection" is defined, as relevant here, as "one year or fifteen thousand miles of use from the date of original delivery of a new motor vehicle, whichever comes first." G. L. c. 90, § 7N 1/2 (1).

Under the statute, "If the manufacturer, its agent or authorized dealer does not conform the motor vehicle to any such applicable express or implied warranty by curing any nonconformity after a reasonable number of attempts, the manufacturer shall accept return of the vehicle from the

consumer." G. L. c. 90, § 7N 1/2 (3). A reasonable number of attempts occurs either when:

> "(a) the same nonconformity has been subject to repair three or more times by the manufacturer or its agents or authorized dealers within the term of protection, but such nonconformity continues to exist or such nonconformity has recurred within the term of protection, or (b) the vehicle is out of service by reason of repair of any nonconformity for a cumulative total of fifteen or more business days during the term of protection."

G. L. c. 90, § 7N 1/2 (4). In addition, even after a "reasonable number of attempts," the manufacturer gets one additional "opportunity to cure," lasting no longer than seven business days, and beginning when "the manufacturer first knows or should have known that the limits specified in clause (a) or (b) have been met or exceeded." G. L. c. 90, § 7N 1/2 (4).

A. Expert testimony. The facts alleged describe several covered nonconformities reported within the term of protection, specifically, not starting, stalling, and losing power.[6] The defendants do not argue that the reasonable number of attempts requirement or the opportunity to cure requirement was not met.[7]

---

[6] The term of protection ended on or about July 23, 2011, as invoices from Tasca show that the vehicle had not reached 15,000 miles one year after purchase.

[7] In an argument directed toward one of the other counts of the complaint, Ford asserts that Tasca is not "simply by virtue of its dealership status" the "manufacturer's agent for the purpose of receiving the notice contemplated by" the statute, General Motors Corp. v. Blackburn, 403 Mass. 320, 324 (1988). Blackburn held only that a dealer is "not necessarily" the

Their arguments with respect to the Lemon Law claim all turn on the need for expert testimony.

The defendants argue first, as the judge concluded, that expert testimony was required to demonstrate these nonconformities.  "The purpose of expert testimony is to assist the trier of fact in understanding evidence or determining facts in areas where scientific, technical, or other specialized knowledge would be helpful."  Commonwealth v. Pytou Heang, 458 Mass. 827, 844 (2011).  Thus, expert testimony is necessary only on subjects that the trier of fact would not "be expected to understand in many circumstances without guidance from an expert."  Providence & Worcester R.R. v. Chevron U.S.A. Inc., 416 Mass. 319, 323 (1993).  It is not necessary in cases in which lay knowledge enables the jury to find the relevant facts. See Smith v. Ariens Co., 375 Mass. 620, 625 (1978).

Whether a cause of action can be proven without expert testimony depends on the elements of the cause of action.  As relevant here, in order to show the Lemon Law applicable, Gliottone was required to show a nonconformity, i.e., a

---

manufacturer's agent for the purpose of receiving that notice. Id.  Here, to the extent it is relevant, there was sufficient evidence of such an agency relationship created by either actual or apparent authority to survive summary judgment.  This evidence includes the description of dealerships, as well as Ford's relationship to them, contained in the warranty document as well as Ford's roadside assistance directing Gliottone to take his vehicle to Tasca.

"specific or generic defect or malfunction, or any concurrent combination of such defects or malfunctions that substantially impairs the use, market value or safety of a motor vehicle." G. L. c. 90, § 7N 1/2 (1).

Contrary to Ford's argument, because it does not matter what is causing the vehicle to malfunction, or even if it can be determined what is causing it, expert testimony is not always required to demonstrate that a vehicle has a nonconformity.  In many circumstances, including these, a rational juror, without an expert, can understand the facts necessary to decide whether a plaintiff has demonstrated an actionable defect or malfunction.  On this issue we agree with the Supreme Court of Indiana, which said in construing that State's Lemon Law:

> "[I]t hardly takes an expert to observe that the brakes will not adequately stop the automobile he is driving.  It was not for the [plaintiffs] to prove why the brakes were not working.  It was sufficient for them to establish to the satisfaction of the trier of fact that they in fact did not function properly. . . .  There is nothing in the 'Lemon Law' statute which requires the purchaser of the automobile to present expert testimony as to the failure of the automobile to perform properly."

General Motors Corp. v. Zirkel, 613 N.E.2d 30, 31 (Ind. 1993).

This is a paradigm case.  At most, three weeks after Gliottone purchased the vehicle, which had at most 1,461 miles on it when first repaired, the vehicle was unable to start, stalled, and lost power.  The relevant invoice showed that the supercharger was installed for "engine repair."  A rational

juror, given this information, clearly could conclude that the vehicle was defective or had a malfunction when sold.  See id. at 30-31 (plaintiff did not need expert to prove manufacturing defect in brakes first repaired thirty-two days after purchase and repaired another nineteen times in next five months).  Contrast Kourouvacilis v. General Motors Corp., 410 Mass. 706, 717 (1991) (plaintiff needed expert to prove that six year old vehicle had defect when purchased, and that this defect caused fire); Walsh v. Atamian Motors, Inc., 10 Mass. App. Ct. 828, 828-829 (1980) (simply pointing to automotive problems insufficient to prove manufacturing defect because vehicle was four years old and had been driven for 63,000 miles).

Nor are the defendants correct that Gliottone needed an expert to negate the statutory affirmative defenses that the nonconformity was the result of an "attempt to repair the vehicle by a person other than the manufacturer, its agent or authorized dealer," or of "any attempt substantially to modify the vehicle which was not authorized by the manufacturer."  G. L. c. 90, § 7N 1/2 (3).  While Ford does claim that the supercharger caused many of the issues that induced Gliottone to return to Tasca and that it was an unauthorized repair, these are disputed facts.  A reasonable juror could conclude, without expert testimony, that problems that persisted unabated before the supercharger was installed, while it was in the truck, and

after it was removed were not caused by the supercharger. A reasonable juror could also infer from the relevant Tasca invoice, Tasca's representations to Gliottone, Ford's actions in sending Gliottone to Tasca to repair the vehicle before and after the supercharger was installed, and Ford's continued payment for warranty services after the installation of the supercharger despite having no obligation to do so under the warranty if the malfunctions were caused by a "modification," that the installation of the supercharger was an authorized repair rather than an unauthorized one or a modification. Tasca appears to argue that Gliottone required expert testimony to demonstrate that the alleged nonconformity "substantially impaire[d] the use, market value or safety" of the truck. G. L. c. 90, § 7N 1/2 (1). A jury does not need an expert, however, to explain that not starting, stalling, and losing power substantially impair the use, market value, or safety of a vehicle.

The other reported case cited by the judge and Ford, Goffredo v. Mercedez-Benz Truck Co., 402 Mass. 97 (1988), to the extent it is relevant at all, supports our conclusions. That case held only that the plaintiff could not prove that a door latch that blew open during an accident in which the truck hydroplaned, veered to the right, jumped the curb, hit a parked car, went perpendicular to the direction of traffic, crossed the

street, hit the opposite curb, and came to a stop was defectively designed without expert testimony "as to the amount of force necessary to cause the door to open."  Id. at 104.  The court made clear that "this was not a case in which the jury could have found, of [their] own knowledge, that the defendant had improperly designed the latch mechanism."  Id.  The court did not hold that expert testimony is required to prove the existence of a malfunction or a defect that is obvious to a lay juror, like the ones alleged here.[8]

Ford's other reported cases are irrelevant.  Providence & Worcester R.R., 416 Mass. at 323, held that expert testimony was required to show a causal relation between an oil spill in 1972 and soil contamination found sixteen years later.  And Esturban v. Massachusetts Bay Transp. Auth., 68 Mass. App. Ct. 911, 912 (2007), involved a design defect that required an expert to "detail[] not only what standards and codes apply, but also how the . . . design did not meet those standards or codes."  This case is not about whether Ford's design of the truck was

---

[8] The same is true of the unreported cases cited by the defendants.  See Morse vs. Ford Motor Co., U.S. Dist. Ct., No. 08-11930, slip op. at 1 (D. Mass. Jul. 13, 2010) (plaintiff required expert testimony to prove tie rod assembly and airbag system in vehicle were defective, which were "highly technical and specialized questions"); Laspesa vs. Arrow Int'l, Inc., U.S. Dist. Ct., No. 07-CV-12370, slip op. at 4-5 (D. Mass. Dec. 23, 2009) (expert testimony required in only "complex" breach of warranty and design defect cases, which that case was).

"unreasonably dangerous," id. at 911, but about whether it sold Gliottone a lemon.[9]

Ford also argues without citation to binding authority that Gliottone cannot prevail on summary judgment because the only support in the record for the truck's alleged stalling, inability to start, loss of power, and other problems are from his own affidavit.  This is inconsistent with Mass. R. Civ. P. 56 (e), 365 Mass. 824 (1974) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial" [emphasis added]).

B.  Other claims.  Gliottone also brought claims of breach of contract and express warranty, breach of the implied warranties of marketability and fitness, breach of the covenant of good faith and fair dealing, unjust enrichment, revocation of acceptance, and violation of G. L. c. 93A against Ford, Tasca, and Rodman, on all of which the judge also granted summary

---

[9] And regardless, our courts have regularly held that expert testimony in design defect cases is not necessary when a lay juror is capable of understanding, without expert testimony, whether or not the design deviated from the applicable standard of care.  See, e.g., Smith, 375 Mass. at 625; doCanto v. Ametek, Inc., 367 Mass. 776, 782 (1975).

judgment on the basis that because Gliottone presented no expert evidence, he could not, as a matter of law, prove that the truck did not conform to the applicable warranties.[10]  In light of our holding that expert testimony is not essential to prove that, we must vacate the judgment on those counts as well in order to allow the judge in the first instance to address any of the other arguments made before us that were made below in support of the motion for summary judgment.

Conclusion.  The judgment is vacated.  Because there are disputed facts on the Lemon Law claim against Ford, summary judgment was inappropriate; that claim must be determined at a trial on the merits.  As to the remaining counts, the judge should address them in the first instance under the summary judgment standard, reconsidering any preserved arguments that she did not reach in her initial summary judgment order.

So ordered.

---

[10] The fraud and the c. 93A claims were not asserted against Rodman.  Gliottone's breach of warranty claims, as well as the revocation of acceptance claim, were brought under the applicable provisions of both the Massachusetts Uniform Commercial Code and the Federal Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301-2312.