JANE H. PERKINS & others[1] vs. PAUL J. RICH & another;[2]
BAY STATE FEDERAL SAVINGS & LOAN ASSOCIATION
& another,[3] interveners.

Plymouth. November 6, 1980. — February 4, 1981.

Present: BROWN, DREBEN, & NOLAN, JJ.

*Corporation*, Officers and agents. *Agency*, Ratification, Scope of author-
ity. *Church*.

Although a church's parish committee, which had authority over the
church's business affairs, had no actual knowledge that the church
minister had without authorization executed mortgages on behalf of
the church, the committee was deemed to have ratified the mortgage
transactions where the committee, despite its knowledge of substantial
and costly physical changes at the church, failed to conduct a reason-
able and prudent inquiry which would have led to discovery of the
mortgages. [318-324]

CIVIL ACTION commenced in the Superior Court on Oc-
tober 20, 1977.

The case was heard by *Chmielinski*, J.

*Mark A. Michelson* (*Lawrence B. Litwak* with him) for
the plaintiffs.

*Marc Redlich* (*Alan R. Hollander* with him) for the
Shawmut First County Bank, N.A.

*James Levensohn* for the Bay State Federal Savings &
Loan Association.

BROWN, J. This action was brought by members of the
parish committee (Committee) of the First Parish Unitarian

---

[1] The named plaintiff and others are elected members and members ex
officio of the parish committee of the First Parish Unitarian Church of
East Bridgewater.

[2] The Attorney General.

[3] Shawmut First County Bank, N.A.

Church of East Bridgewater (Church) who sought the appointment of a temporary receiver to determine the financial status of the Church, to administer certain Church property and to manage certain Church activities. A temporary receiver was appointed on October 28, 1977, and a temporary injunction issued against all Church creditors barring them from prosecuting any claims.

The Committee brought this action because of transactions undertaken by the Church's minister, Paul John Rich, who, along with the Attorney General,[4] was named a codefendant. Two holders of mortgages of Church property, Bay State Federal Savings and Loan Association (Bay State) and Shawmut First County Bank, N.A. (Shawmut), intervened. The case was referred to a master on January 9, 1978, for the sole purpose of determining the validity of the mortgages to those banks by instruments which Rich executed on behalf of the Church.[5] On January 29, 1979, the master filed a report concluding that the mortgages were valid. On May 8, 1979, a judge of the Superior Court adopted the master's report in its entirety and entered judgment for Shawmut and Bay State.[6] The plaintiffs appeal from that judgment.

We derive our facts from the master's subsidiary findings,[7] which "are binding upon us unless they are clearly erroneous, mutually inconsistent, contradictory or vitiated in view of the controlling law." *John F. Miller Co.* v. *George Fichera Constr. Corp.*, 7 Mass. App. Ct. 494, 495 (1979), and cases cited. See Mass.R.Civ.P. 53(e)(2), 365

---

[4] Although nominally a defendant, the Attorney General has taken a position virtually indistinguishable from that of the plaintiffs.

[5] The order of January 9, 1978, also continued the temporary receivership and temporary injunction until further order of the court.

[6] The judgment also dissolved the temporary injunction, thereby allowing Shawmut and Bay State to proceed with foreclosure.

[7] At the request of the parties the master made 259 special findings of fact, which were filed along with his report. The evidence is not reported.

Mass. 820 (1974). The Church, a religious association founded in 1723 by St. 1723, c. 350, functioned until the mid 1960's with a relatively small membership and budget. Its by-laws, as amended in 1960, provide that a parish committee be in "general charge of all business affairs . . . and property" of the Church.[8]

In 1962, the Church hired defendant Rich to be its minister at a small salary. Rich initially performed his ministerial duties without controversy.

During the mid-1960's, possibly because of "psychological-traumatization by the Vietnam War," Rich's personality as well as his perceived role in the Church underwent a significant change. Rich initiated a highly publicized anti-war ministry. With Rich at the forefront, the Church expanded from a membership of twelve families and a budget of $5,000 to a membership of over four hundred families. By 1965, Rich began to assume responsibility for the Church's financial affairs and, without formal authorization from the Committee or the Church membership, borrowed considerable amounts of money for the renovation and improvement of Church property as well as the acquisition of other property.[9] By 1969, Rich had assumed complete control of the Church's business and financial affairs. The Committee had ceased to meet after 1968, and "it made no effort to continue its former role as the business center of the Church." Moreover, no annual meeting of the Church membership occurred after 1969. Rich became, in effect, the sole operating officer, holding himself out as president and treasurer as well as minister. Under his direction, the

---

[8] The by-laws also provide for a finance committee to supervise the Church's endowment, trusts and permanently invested funds.

[9] In 1965, the Church borrowed $78,000 from Plymouth-Home National Bank, a loan which was later guaranteed by the entire Committee. In June, 1969, Rich, as president and treasurer, obtained a $100,000 loan from Shawmut on behalf of the Church, $78,000 of which was used to repay the outstanding Plymouth-Home National Bank loan. This loan, which has been extended or refinanced at least twenty-five times, is not involved in the present dispute.

Church began to embark on a new "community loosely modeled on Sturbridge/Williamsburg/Strawberry Bank concept," which would feature museums, galleries and other exhibits. The project was to be financed by the profits of a proposed large scale elderly housing development, which in turn was to be financed primarily from Federal funds. Although Rich and his family contributed over $100,000 to the Church, the program relied heavily on bank loans such as the three mortgage notes in issue here.[10]   By 1973, expenditures for construction on Church property had amounted to over $175,000. The work included large scale construction obvious to all Church members such as: placement of a railroad car adjacent to the Church; interior renovation; extensive landscaping; two swimming pools, carpentry work, an art gallery and sculpture in the Church common; and construction of parking lots.

The proposed community, however, ran into financial difficulties. Sewerage problems rendered the elderly housing project unbuildable, which in turn led to the unavailability of Federal funds. As other avenues of financing could not match the anticipated profits of the housing development, construction of the "new community" was thereby forestalled.

No action was taken by the Church membership until the summer of 1977, when it became apparent that the mortgage notes were in default. A new Committee and finance committee were elected, and this action ensued. The Church claims that the mortgages are invalid because they were given without authorization from the Committee.

Similar to most of the other transactions negotiated during Rich's tenure, the mortgages given to Bay State and Shawmut were signed by Rich on behalf of the Church in his capacity as president and treasurer. Each bank was

_____

[10] Rich negotiated these mortgages on behalf of the Church in his capacity as president, treasurer and minister. Two mortgages were given to Bay State on October 18, 1972, and April 20, 1973, respectively, and one to Shawmut dated November 5, 1975.

given a previously recorded document which purportedly established his authority to act on behalf of the "Church corporation."[11] The master found, however, that the banks could not in good faith rely on these documents to establish Rich's authority. Although the Church was found to be a de facto corporation, and Rich its de facto president and treasurer, Rich's lack of authority should have been apparent to the banks due to irregularities on the face of each document.[12] These irregularities created a duty upon the banks to inquire further as to Rich's authority, an investigation which would have revealed the true Church structure. The master further found that this would have saved the day for the Church but for the fact that reasonable and prudent inquiry by the Church would have brought about discovery of the mortgages. The Church's failure to assert its rights, once put on notice of unusually large expenditures, constituted ratification of Rich's actions.[13]

The Committee (and the Attorney General) filed numerous objections to the master's report whereas the banks merely moved to have the objections struck and the report adopted in its entirety. In these circumstances, the only

---

[11] Bay State was given the document referred to as the "Mosher Certificate," as it was signed by one "Arthur Mosher, Clerk of Trustees."

Shawmut was given the document referred to as the "Thayer Certificate," as it was attested to by "Ruth Churchill Thayer, Clerk and Secretary of Corporation."

[12] The reference in the Mosher certificate to a vote of the trustees authorizing Rich "on behalf of the Church . . . to sign and execute any notes and mortgages necessary" for mortgaging Church property was found to be incomplete on its face, as it was not apparent where the "trustees" fit into the Church structure. The master found that an investigation would have disclosed that there were no trustees in the church structure.

The statement in the Thayer certificate (given to Shawmut) that Rich was "trustee" of the Church's "funds, properties, real estate . . . and other holdings" was found to be inconsistent with the banks' own title reports which established the Church as legal owner. A simple business letter, the master found, could have clarified this apparent inconsistency.

[13] The master also found the Church's inaction constituted estoppel, laches and abandonment.

issue before us in this appeal is whether the Committee's inaction amounted to ratification.[14]

The Committee claims that it did not know of the existence of the mortgages and thus that its failure to repudiate the mortgages resulted not from a ratification of the transactions, but from ignorance of essential facts. Generally, in order to establish ratification of unauthorized acts of an agent, a principal must have "full knowledge of all material facts." *Combs* v. *Scott*, 12 Allen 493, 496 (1866). *Beacon Trust Co.* v. *Souther*, 183 Mass. 413, 416 (1913). *James F. Monaghan, Inc.* v. *M. Lowenstein & Sons*, 290 Mass. 331, 334-335 (1935). Ignorance of such facts will not lead to liability. *Combs* v. *Scott, supra* at 496. However, a qualification to this rule is that one cannot "purposefully shut his eyes to means of information within his own possession and control" (*id.* at 497), having only that knowledge "which he cares to have." *Kelley* v. *Newburyport & Amesbury Horse R.R.*, 141 Mass. 496, 498-499 (1886). *Dole Bros.* v. *Cosmopolitan Preserving Co.*, 167 Mass. 481, 483 (1897). *Kidder* v. *Greenman*, 283 Mass. 601, 615 (1933). This is especially true of the Committee, which functioned as the "business center" of the Church and had a duty to keep itself informed of Church business. See *Lonergan* v. *Highland Trust Co.*, 287 Mass. 550, 557 (1934); *Juergens* v. *Venture Capital Corp.*, 1 Mass. App.

---

[14] The master made various findings concerning Rich's lack of authority which are now contested on appeal by the banks. One of the contested findings is that the banks could not in good faith rely on the recorded certificates purportedly establishing Rich's authority. See G. L. c. 156B, § 115. The banks, however, took no action either before the master or the trial court to contest this finding (or any finding of the master), nor did they move to recommit for additional findings. See Mass.R.Civ.P. 53(e)(2), and Rule 49(7) of the Superior Court (1967). Although arguably a conclusion of law (see *Wormstead* v. *Town Manager of Saugus*, 366 Mass. 659, 662 n.3 [1975]), and thus normally open for our consideration on appeal, the matter is not properly before us. See *Michelson* v. *Aronson*, 4 Mass. App. Ct. 182, 192-193 (1976); *LaRose* v. *Campbell*, 5 Mass. App. Ct. 840, 841 (1977); *King* v. *Allen*, 5 Mass. App. Ct. 868 (1977); *O'Day* v. *Theran*, 7 Mass. App. Ct. 622, 624 (1979).

Ct. 274, 278 (1973); *Baltimore & O.R.* v. *Foar,* 84 F.2d 67, 71 (7th Cir. 1936).

Further, as found by the master, the Committee was not totally ignorant of Rich's actions. Contrast *Connelly* v. *S. Slater & Sons,* 265 Mass. 155, 157 (1928). From the many indicia of the radical physical and structural changes to the church and its surroundings, it should have been obvious to the Church that "something [was] afoot." The very nature of the construction and renovation indicated that large expenditures were being made. Although Rich was far from candid in his disclosures, he did inform Church members of various projects at Church events and through annual reports and publications. The Committee, whose responsibility was to approve payment of all bills, and Church members in general, deliberately ignored these facts. Contrast *Kidder* v. *Greenman,* 283 Mass. at 615; *Dole Bros.* v. *Cosmopolitan Preserving Co.,* 167 Mass. at 483. By not asking the simple question — "What is going on?" — as suggested by the master, the Committee assumed the risk of what its investigation might have disclosed.[15] See Restatement (Second) of Agency § 91, Comment e (1958).

We thus conclude that the Committee's knowledge of substantial and costly physical changes at the Church should have provoked an investigation by the Committee which would have led to the discovery of the mortgages. In these circumstances the Committee's failure to act "will be deemed to constitute actual knowledge." *Ingalls Iron Works Co.* v. *Ingalls,* 177 F. Supp. 151, 162 (N.D. Ala. 1959), aff'd 280 F.2d 423 (5th Cir. 1960). 2 Fletcher, Cyclopedia of the Law of Private Corporations § 757 (rev. perm. ed. 1969). By failing to disavow the mortgages, the Church ratified the transactions, a ratification which may be inferred without a vote by the Committee. *Juergens* v. *Venture Capital Corp.,* 1 Mass. App. Ct. at 279. See *Boice-*

---

[15] The master found that an inquiry as to Rich's actions should have commenced at least by May 4, 1974, the date when the railroad car was put in place.

*Perrine Co.* v. *Kelley,* 243 Mass. 327, 330-331 (1923); *Irving Tanning Co.* v. *Shir,* 295 Mass. 380, 384 (1936).

Accordingly, the mortgages are valid and binding upon the Church, and the judgments of the Superior Court must be affirmed.

*So ordered.*