Troy, Paul E., J.
On August 1, 2011, Salvatore Licata (“Licata”), as the administrator of his mother Rita’s estate, filed this wrongful death action against GGNSC Malden Dexter, LLC d/b/a Dexter House Nursing Home (“GGNSC”), alleging that in August of 2008, the nursing home’s negligence resulted in personal injuries to Rita which caused her death on August 10, 2009. The complaint alleges wrongful death resulting in conscious pain and suffering, negligent violation of state and federal regulations governing long-term health facilities, breach of contract, and violations of G.L.c. 93A.
On October 7, 2011, GGNSC filed this Motion to Dismiss Complaint and Compel Arbitration based on an arbitration agreement executed by Licata when Rita was admitted to the nursing home. By Order dated December 15, 2011, this Court (Connors, J.) ordered an evidentiary hearing with respect to the enforceability of the arbitration agreement. This Court conducted such a hearing on January 30, 2012. Based on all the credible testimonial and documentary evidence and the reasonable inferences to be drawn from that evidence, the court finds the following facts.
FINDINGS OF FACT
On August 18,2008, Rita was admitted to the Metro West Medical Center Geropsychiatric Treatment Unit in Natick for evaluation of increased confusion with increased lability, behavioral disturbance with wandering, pacing, increased restlessness and unsafe behaviors, poor insight and judgment, and poor safety awareness. Licata was listed on the admission form as her next of kin. The next day, Rita execute^ a Massachusetts Health Care Proxy appointing Licata as her health care agent and stating, in relevant part:
My Agent shall have the authority to make all health care decisions for me, including decisions about life-sustaining treatment, subject to any limitations I state below, if I am unable to make health care *468 decisions myself. My Agent’s authority becomes effective if my attending physician determines in writing that I lack the capacity to make or to communicate health care decisions.
Rita’s treating physician, Dr. Helen Kyomen, diagnosed her with delirium related to multiple conditions including increased pain from left foot ulceration and right foot cellulitis, and dementia of the Alzheimer type.
On August 22, 2008, Rita was discharged from the hospital and transferred to the nursing home with a diagnosis of delirium-resolving and dementia of the Alzheimer type with behavioral disturbance. The discharge summary authored by Dr. Kyomen states that during Rita’s stay in the hospital, “Insight and judgment were chronically impaired.” On the discharge form, in the line for patient signature, Dr. Kyomen wrote, “unable to sign.” Licata was the only one available to drive Rita to the nursing home and admit her, because Rita’s husband is illiterate. Licata had admitted Rita to hospitals in the past but this was the first time he dealt with the Medicare nursing home process. Licata and Rita arrived at the nursing home at 10:20 p.m. and Rita immediately was taken to her residential room. The nursing home admissions director at the time, Rose Ann Meagher (“Meagher”), took Licata into an office to fill out the necessary admissions paperwork. At some point during the admission process, Meagher went into Rita’s room, which was only a short distance away, and told Rita that Licata was signing some papers for her and would discuss them with her later. Rita did not appear to understand and did not respond. The nursing home’s practice is to have the patient sign the documents if he or she is alert and able to do so; otherwise, a family member is asked to sign. Meagher filled out all Rita’s paperwork, document by document, explained each one to Licata, and then showed him where to sign. Licata is not sophisticated in such matters and signed all of the paperwork without fully understanding the contents because he believed he had to sign every document in order for Rita to be admitted. He was given a copy of all the documents after his mother was admitted. Licata never told Meagher that he was Rita’s guardian or that he had a power of attorney to act for her.
One of the documents signed by Licata is an Admission Agreement. On the Admission Agreement Signature Page, Licata signed his name on the line designated “Name of Resident’s Legal Representative” rather than on the line designated “Name of Resident’s Agent.” However, immediately below his signature is a section instructing him to check off the “Type of Legal Representative,” with boxes for Conservator of Person, Conservator of Estate, Guardian, Durable Power of Attorney for Health Care, or Agent Acting Under General Power of Attorney. Neither Licata nor Meagher checked any of these boxes.
Licata initialed and signed certain documents as Rita’s “Authorized Representative” but refused to sign a section authorizing automatic credit card payments to the nursing home. Meagher wrote in the margin, “NO.” Licata signed an Immunization Consent or Refusal and a health insurance benefits assignment form as a “Responsible Party.” He signed a Medicare Secondary Payer Screening Form and a Prescription Drug Coverage Profile as the “Resident Representative.” Although Licata signed a MassHealth Permission to Share Information Form as “someone who has the legal authority to act on behalf of the applicant/member,” the form required that the authorizing legal documents be attached in the case of guardianship, power of attorney, or health-care proxy, and no such documents are attached. Licata signed a Written Acknowledgment Form: Attorney General’s Consumer Protection Regulations: 940 CMR4.00 as “Next of Kin Resident” rather than “Legal Representative of Resident.”
Licata signed a two-page document entitled, “RESIDENT AND FACILITY ARBITRATION AGREEMENT’ (“the Agreement”). Immediately below the title, the document states in bolded letters: “(NOT A CONDITION OF ADMISSION — READ CAREFULLY).”[2] The Agreement states in relevant part:
It is understood and agreed by Facility and Resident that any and all claims, disputes, and controversies (hereafter collectively referred to as a “claim” or collectively as “claims”) arising out of, or in connection with, or relating in any way to the Admission Agreement or any service or health care provided by the Facility to the Resident shall be resolved exclusively by binding arbitration to be conducted at a place agreed upon by the Parties, or in the absence of such an agreement, at the Facility, in accordance with the National Arbitration Forum Code of Procedure, which is hereby incorporated into this Agreement, and not by a lawsuit or resort to court process. This Agreement shall be governed by and interpreted under the Federal Arbitration Act, 9 U.S.C. Sections 1-16.
This Agreement to arbitrate includes, but is not limited to, any claim for payment, nonpayment, or refund for services rendered to the Resident by the Facility, violations of any right granted to the Resident by law or by the Admissions Agreement, breach of contract, fraud or misrepresentation, negligence, gross negligence, malpractice, or claims based on any departure from accepted medical or health care or safety standards, as well as any and all claims for equitable relief or claims based on contract, tort, statute, warranty, or any alleged breach, default, negligence, wantonness, fraud, misrepresentation, suppression of fact, or inducement . . .
... In the event a court having jurisdiction finds any portion of this agreement unenforceable, that *469 portion shall not be effective and the remainder of the agreement shall remain effective.
It is the intention of the parties to this Arbitration Agreement that it shall inure to the benefit of and bind the parties, their successors, and assigns, including without limitation the agents, employees and servants of the Facility, and all persons whose claim is derived through or on behalf of the Resident, including any parent, spouse, sibling, child, guardian, executor, legal representative, administrator, or heir of the Resident. The parties further intend that this agreement is to survive the lives or existence of the parties hereto . . .
... THE PARTIES UNDERSTAND AND AGREE THAT THIS CONTRACT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES, AND THAT BY ENTERING INTO THIS ARBITRATION AGREEMENT, THE PARTIES ARE GIVING UP AND WAIVING THEIR CONSTITUTIONAL RIGHT TO HAVE ANY CLAIM DECIDED IN A COURT OF LAW BEFORE A JUDGE AND A JURY, AS WELL AS ANY APPEAL FROM A DECISION OR AWARD OF DAMAGES.
The Resident understands that (1) he/she has the right to seek legal counsel concerning this Arbitration Agreement, (2) that execution of this Arbitration Agreement is not a precondition to admission or to the furnishing of services to the Resident by the Facility, and (3) this Arbitration Agreement may be rescinded by written notice to the Facility from the Resident within thirty days of signature . . .
. . . The undersigned certifies that he/she has read this Arbitration Agreement and that it has been fully explained to him/her, that he/she understands its contents, and has received a copy of the provision and that he/she is the Resident, or a person duly authorized by the Resident or otherwise to execute this agreement and accept its terms.
The Resident signature line is blank. Below it is the statement: “If the resident is unable to consent or sign this provision because of physical disability or mental incompetence or is a minor and an authorized representative is signing this provision, complete the following:” Underneath this statement is the date, August 22,2008, Licata’s signature on aline stating “Authorized representative,” and the signature of a witness. On a line stating, “Relationship to Resident,” Meagher wrote “mother.”
Approximately two weeks after Rita was admitted to the nursing home, on September 10, 2008, her treating physician executed a document entitled, “DOCUMENTATION OF RESIDENT INCAPACITY PURSUANT TO MASSACHUSETTS HEALTH CARE PROXY ACT M.G.L.c. 201D,” stating that Rita lacked the capacity to make health care decisions due to dementia and Alzheimer’s. Following Rita’s admission, Meagher frequently saw Licata around the nursing home and he never said anything about the Agreement or any of the other admission documents.
Rita herself never did or said anything which would constitute ratification of Licata’s act of signing the Agreement.
On July 17, 2009, the National Arbitration Forum (“NAF”) entered into a Consent Judgment with the Attorney General for the State of Minnesota under which NAF terminated its involvement in consumer arbitrations effective July 24, 2009.
RULINGS OF LAW
GGNSC moves for dismissal of the complaint and an order to compel arbitration pursuant to G.L.c. 251, §2(a), which provides in relevant part:
A party aggrieved by the failure or refusal of another to proceed to arbitration under an agreement described in section one may apply to the superior court for an order directing the parties to proceed to arbitration. If the opposing party denies the existence of the agreement to arbitrate, the court shall proceed summarily to the determination of the issue so raised and shall, if it finds for the applicant, order arbitration; otherwise, the application shall be denied.
Section 1 of the statute provides in relevant part:
A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties shall be valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract.
The statute expresses a strong public policy favoring arbitration as an expeditious alternative to litigation for settling commercial disputes. St. Fleur v. WPI Cable Sys./Mutron, 450 Mass. 345, 349 (2008); Miller v. Cotter, 448 Mass. 671, 676 (2007). Only generally applicable contract defenses such as fraud, duress, or unconscionability can be used to invalidate arbitration agreements. Miller v. Cotter, 448 Mass. at 679.
I. UNCONSCIONABILITY
Licata contends that the Agreement is unenforceable because it is unconscionable. Unconscionability is decided on a case by case basis, with particular attention to whether at the time of execution of the contract, the challenged provision could result in oppression and unfair surprise to the disadvantaged party, and not to allocation of risk because of superior bargaining power. Miller v. Cotter, 448 Mass. at 679; Waters v. Min Ltd., 412 Mass. 64, 68 (1992). Whether a contract is unconscionable is a question of law for the court to be determined in light of its setting, purpose and effect. Miller v. Cotter, 448 Mass. at 679; Zapatha v. Dairy Mart, Inc., 381 Mass. 284, 291 (1980).
Licata argues that the Agreement is procedurally unconscionable because it was executed at a late hour, by an unsophisticated individual, under circumstances *470 where the parties had unequal bargaining power, and he was compelled to sign based on his mother’s need for treatment. However, there is no procedural uncon-scionability where the arbitration agreement was a separate document, not buried in a lengthy admission agreement, and execution of the agreement was not a condition of admission. See Miller v. Cotter, 448 Mass. at 680-81 (upholding nearly identical arbitration agreement in context of nursing home admission). There is no evidence that Meagher exerted undue pressure on Licata to sign the agreement, which clearly indicated that execution was not mandatory and that it should be read carefully. Moreover, Licata could revoke the Agreement within 30 days. Cf. Howell v. NHC Healthcare-Fort Sanders, Inc., 109 S.W.3d 731, 734-35 (Tenn.Ct.App. 2003) (arbitration agreement buried in nursing home admission document was unconscionable where husband was forced to sign it as condition of wife’s admission, husband admitted wife in emergency situation, and there was no way to revoke waiver). Licata’s failure to read the agreement word for word “makes no difference, as we have long held that, absent fraud, a party’s failure to read or understand a contract provision does not free him from its obligations.” Miller v. Cotter, 448 Mass. at 680. Accordingly, unconsdonability is not a basis for avoiding the Agreement.[3]
II. LACK OF AUTHORITY TO EXECUTE AGREEMENT
Licata further contends that the Agreement is unenforceable because he was not authorized by Rita to waive her constitutional right to a jury trial. See Stern v. Lieberman, 307 Mass. 77, 79 (1940); Medeiros v. Middlesex Insurance Co., 48 MassApp.Ct. 51, 57 (1999) (authorized agent can bind disclosed principal to contract as if principal had entered into contract directly).
A. Health Care Proxy
GGNSC argues that Licata was authorized to sign the Agreement under the health care proxy executed by Rita. The proxy states: “My Agent’s authority becomes effective if my attending physician determines in writing that I lack the capacity to make or to communicate health care decisions.” This Court is not persuaded that the proxy was activated on August 22 when Dr. Kyomen, in a transfer report, made a written diagnosis of dementia of the Alzheimer’s type, noted Rita’s chronically impaired insight and judgment, and indicated that she was unable to sign the discharge form. It is not clear that Dr. Kyomen intended to make a written determination of incapacity to make health care decisions in accordance with the Health Care Proxy Act, G.L.c. 201, §6. In contrast, two weeks after Rita’s admission to the nursing home, her treating physician executed a document entitled, “Documentation of Resident Incapacity Pursuant to Massachusetts Health Care Proxy Act M.G.L.c. 20 ID” which clearly states that she is unable to make her own medical decisions due to dementia and Alzheimer’s. In the view of this Court, Dr. Kyomen’s transfer report did not satisfy the statute and did not activate Rita’s health care proxy. Accordingly, the proxy did not authorize Licata to execute the Agreement on August 22.
Even if the health care proxy were activated as of the date of Rita’s admission, it does not appear that it gave Licata authority to sign an arbitration agreement on her behalf. Under Chapter 20 ID, an agent has authority to make “any and all health care decisions on the principal’s behalf that the principal could make . . .” G.L.c. 20 ID, §5. The term “health care” is defined as “any treatment, service or procedure to diagnose, or treat the physical or mental condition of a patient.” G.L.c. 201D, §1. The admission of the principal to a nursing home is a health care decision under the statute. Cf. Cohen v. Bolduc, 435 Mass. 608, 616 (2002) (admission to mental health facility within contemplated authority of health care agent under Chapter 201D). However, in the view of this Court, a waiver of the principal’s legal right to seek redress in court for improper medical treatment does not fall within the statutory definition of a health care decision. See Blankfeld v. Richmond Health Care, Inc., 902 So.2d 296, 300 (Fla.Ct.App.), rev. den., 917 So.2d 195 (2005) (statute authorizing health care proxy to make “health care decisions” for incapacitated patient did not include decision to waive right to sue); Pagarigan v. Lubby Care Ctr., Inc., 120 Cal.Rptr.2d 892, 895 (Cal.Ct.App. 2002) (statute authorizing next of kin to make medical treatment decisions for incompetent patient did not authorize signing of arbitration agreement). But see Trinity Mission of Clinton, LLC v. Barber, 988 So.2d 910, 917 (Miss.Ct.App. 2007) (concluding that under state Health Care Decisions Act, authority to make health care decisions for patient includes authority to bind patient to arbitration). Thus, the health care proxy, even if effective at the time of Rita’s admission, did not authorize Licata to waive her constitutional right to ajury trial in the event of a dispute with the nursing home.
B. Actual Authority
In the alternative, GGNSC argues that it can rely on common-law principles of agency to establish the validity of the Agreement. See G.L.c. 201D, §16 (where no health care proxy executed, statute does not preclude health care provider from relying on informed consent of responsible parties on behalf of incompetent or incapacitated patients to extent permitted by law). An agency relationship is created when there is mutual consent, express or implied, that the agent is to act on behalf of and for the benefit of the principal, and subject to the principal’s control. Theos Sons, Inc. v. Mack Trucks, Inc., 431 Mass. 736, 742 (2000). Here, there is no evidence that Rita gave Licata actual authority to sign an arbitration agreement on her behalf. See Pagarigan v. Lubby Care Cntr., Inc., 120 Cal.Rptr.2d at 894 (arbitration agreement signed by daughter in connection with admission of comatose mother to nursing home was invalid where daughter did not have power of attorney).
Even if this Court assumes that prior to her admission, Rita gave Licata authority to make medical deci *471 sions for her, including the decision to admit her to a nursing home, that does not equate to an agency for the purpose of making purely legal decisions such as the waiver of the constitutional right to a jury trial. See Goliger v. AMS Properties, Inc., 19 Cal.Rptr.3d 819, 821 (Cal.Ct.App. 2004) (authority from mentally alert mother to daughter to make medical decisions, including to admit her to nursing home, did not extend to signing arbitration agreement). Cf. Ruesga v. Kindred Nursing Ctrs. West LLC, 161 P.3d 1253, 1263 (Ariz.Ct.App. 2007), rev. den., 2008 Ariz. LEXIS 16 (2008) (findingthat medical records demonstrating a history of wife making medical decisions for husband and designating her as his legally authorized representative created agency relationship which permitted wife to execute arbitration agreement with rehabilitation center). Based on the evidence before this Court, Licata did not have actual authority to bind Rita to the Agreement.
C. Apparent Authority
Moreover, GGNSC has not established that Licata had apparent authority to execute an arbitration agreement on Rita’s behalf. Apparent authority is created by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes a third person to believe that the principal consents to have an act done on her behalf by the person purporting to act for her. Theos & Sons, Inc. v. Mack Trucks, Inc., 431 Mass. at 745; Shear v. Gabovitch, 43 Mass.App.Ct. 650, 671, rev. den., 426 Mass. 1105 (1997). Apparent authority exists only if the third person reasonably relied on the principal’s words or conduct at the time it entered the transaction that the agent is authorized to act on the principal’s behalf. Theos & Sons, Inc. v. Mack Trucks, Inc., 431 Mass. at 745; Hudson v. Massachusetts Prop. Ins. Underwriting Ass’n, 386 Mass. 450, 457 (1982). GGNSC emphasizes that Licata signed all of the admission documents on lines describing him as Rita’s “authorized representative” or “legal representative.” However, a putative agent’s own statements and conduct cannot create apparent authority. Normandin v. Eastland Partners, Inc., 68 Mass.App.Ct. 377, 385 (2007); Rubel v. Hayden, Harding & Buchman, Inc., 15 Mass.App.Ct. 252, 255 (1983). Upon arrival at the nursing home, Rita was immediately taken to her residential room and was not present when Licata signed the admission documents. There is no evidence of any conduct by Rita, as principal, that would vest Licata with apparent authoriiy to execute a waiver of her legal rights. See Trinity Mission of Clinton, LLC v. Barber, 988 So.2d 910, 916 (Miss.Ct.App. 2007) (son’s act of signing nursing home admission papers as “authorized representative” of mother did not create apparent authority, absent conduct of mother indicating she gave son authority to do so). Based on the evidence before this Court, Licata did not have apparent authority to execute the Agreement on Rita’s behalf.
D. Ratification
Nor can this Court find that Rita, who was suffering from dementia, knowingly ratified Licata’s execution of the Agreement. A principal’s failure to promptly disavow unauthorized acts by an agent constitutes ratification only if the principal has full knowledge of all material facts. See Linkage Corp. v. Trustees of Boston Univ., 425 Mass. 1, 18, cert. den., 522 U.S. 1015 (1997). Cf. Perkins v. Rich, 11 Mass.App.Ct. 317, 322 (1981), aff'd, 385 Mass. 1001 (1982) (noting that principal cannot avoid ratification by purposefully shutting her eyes to means of information within her possession and control). Ratification is a question of fact. The Colony of Wellfleet Inc. v. Harris, 71 Mass.App.Ct. 522, 529, rev. den., 451 Mass. 1106 (2008). In light of Rita’s mental condition and the fact that she was not present when Licata executed the admission documents, her failure to object at the time Licata signed the Agreement cannot be deemed to constitute ratification.
Because it appears that Rita was simply unaware of the nature and contents of any documents signed by Licata, her failure after admission to repudiate the Agreement cannot be deemed to constitute ratification. For all these reasons, the Agreement is not a valid written agreement to arbitrate under G.L.c. 251, §1 because it was not executed by Rita or one authorized to waive her constitutional right to a jury trial.
III. ENFORCEMENT OF AGREEMENT AGAINST THIRD-PARTY BENEFICIARY
GGNSC further argues that the Agreement is binding on Rita as a third-party beneficiary. An arbitration agreement may be enforced by or against a non-party who is an intended third-party beneficiary of that agreement. Constantino v. Frechette, 73 Mass.App.Ct. 352, 356 (2008), rev. den., 454 Mass. 1112 (2009). However, it must appear from the language and circumstances of the contract that the parties clearly and definitely intended the beneficiary to benefit from the promised performance. Miller v. Mooney, 431 Mass. 57, 63 (2000); Constantino v. Frechette, 73 Mass.App.Ct. at 356.
In cases where an arbitration provision appears within a nursing home admission or residency agreement, courts have found the patient to be an intended third-party beneficiary of the contract between a relative who signs it and the nursing home, thus binding the patient and her wrongful death beneficiaries to arbitration. See JP Morgan Chase & Co. v. Conegie, 492 F.3d 596, 599-600 (5th Cir. 2007); Alterra Healthcare Corp. v. Estate of Linton, 953 So.2d 574, 579 (Fla.CtApp. 2007); Trinity Mission of Clinton, LLC v. Barber, 988 So.2d at 919. These cases have reasoned that because the nursing home admission contract names the patient as the individual receiving medical care and residential services from the nursing home, the parties clearly intended the patient to be a third-party beneficiary of the agreement. See Trinity Mission of Clinton, LLC v. Barber, 988 So.2d at 919; JP Morgan Chase & Co. v. Conegie, 492 F.3d at 599-600. Here, however, the arbitration provision is a separate document and independent contract from the other documents concerning admission and treatment. Moreover, execution of the Agreement *472 was not a condition of admission and thus was not a prerequisite to Rita’s receipt of services from the nursing home. Accordingly, this Court concludes that the Agreement is not enforceable against Rita and her estate under a third-party beneficiary theory.
IV. UNAVAILABILITY OF FORUM
Finally, Licata contends that in any event, the Agreement is unenforceable because the NAF is no longer available to arbitrate consumer claims. The Agreement states that the parties’ disputes shall be resolved exclusively by binding arbitration in accordance with the NAF Code of Procedure, and contains no provision for an alternate arbitrator. General Laws Chapter 251, section 3 provides:
If the arbitration agreement provides a method of appointment of arbitrators, such method shall be followed. In the absence thereof, or if the agreed method fails or for any reason cannot be followed, or if an arbitrator appointed fails or is unable to act and his successor has not been duly appointed, the court on application of a party shall appoint an arbitrator. An arbitrator so appointed shall have all the powers of an arbitrator specifically named in the agreement.
Under the analogous provision of the Federal Arbitration Act, 9 U.S.C. §5, an arbitration agreement will not fail because of the unavailability of a chosen arbitrator unless the parties’ choice of forum is an integral part of the agreement to arbitrate, rather than an ancillary logistical concern. See Brown v. ITT Consumer Fin. Corp., 211 F.3d 1217, 1222 (11th Cir. 2000). GGNSC argues that this Court can sever the provision identifying NAF as the arbitrator and enforce the remainder of the Agreement by appointing a different arbitrator.
Several courts have found that a provision for arbitration exclusively under the NAF Code, which provides that arbitrators must be members of NAF and are the only people authorized to administer the Code, is an integral part of an agreement to arbitrate, such that the agreement is unenforceable upon NAF’s unavailability. See Carideo v. Dell, Inc., 2009 WL 345933 at *4-6 (W.D.Wash. 2009); Carr v. Gateway, Inc., 918 N.E.2d 598, 603 (Ill.App.Ct. 2009); Stewart v. GGNSC-Canonsburg, 9 A.3d 215, 219-21 (Pa.Super.Ct. 2010). These courts have recognized that the NAF has a very specific set of rules and procedures that implicates eveiy aspect of the arbitration. See Carr v. Gateway, Inc., 918 N.E.2d at 603. Cf. Covenant Health & Rehabilitation of Picayune, LP v. Estate of Moulds, 14 So.3d 695, 708-09 (Miss. 2009) (nursing home arbitration agreement was unenforceable where it required arbitration by AAA, but AAA voluntarily stopped conducting nursing home arbitrations unless parties signed post-dispute arbitration agreement); Grant v. Magnolia Manor-Greenwood, Inc., 678 S.E.2d 435, 439 (S.C. 2009) (nursing home arbitration agreement was unenforceable where essence of agreement was arbitration by AHLA, which stopped conducting personal injury arbitrations based on pre-dispute agreements).
This Court acknowledges that other courts have concluded that the selection of NAF is not integral to an arbitration agreement, and have appointed an alternate arbitrator. See Khan v. Dell, Inc., 2012 U.S.App. LEXIS 1167 at *13-17 (3rd Cir. 2012) (language that dispute was to be “resolved exclusively and finally by binding arbitration and administered by the NAF” was ambiguous as to whether NAF was integral part of agreement, such that arbitration was enforceable despite NAF’s unavailability); Jones v. GGNSC Pierre LLC, 684 F.Sup.2d 1161, 1167 (S.D. 2010) (nursing home arbitration agreement, enforceable despite NAF’s inability to arbitrate consumer suit because severance clause demonstrated that selection of NAF was not integral to agreement); Brown v. ITT Consumer Financial Corp., 211 F.3d at 1222 (employment arbitration agreement enforceable despite NAF’s unavailability). However, notwithstanding the severance clause in the Agreement, this Court finds the selection of NAF to be integral to the parties’ bargain in light of the emphatic language identifying NAF and incorporating the NAF Code of Procedure. Accordingly, even if the Agreement were validly executed by Licata on Rita’s behalf, it would nonetheless be unenforceable due to NAF’s unavailability to serve as arbitrator.
ORDER
For the foregoing reasons, it is ORDERED that Defendant GGNSC Malden Dexter, LLC’s Motion to Dismiss Complaint and Compel Arbitration be DENIED.

According to Meagher, patients or their relatives routinely ended up signing the Arbitration Agreement.

A contract may be oppressive, and thus unconscionable, where its terms are unreasonably favorable to one party and allocate the risks and benefits of the agreement in a grossly disproportionate way. Zapatha v. Dairy Mart, Inc., 381 Mass. at 293-95 & n. 13. The doctrine of unconscionability provides protection against terms that produce an unfair and burdensome result, contrary to the spirit of the bargain. Id. at 297. “If the sum total of the provisions of a contract drive too hard a bargain, a court of conscience will not assist its enforcement.” Waters v. Min Ltd., 412 Mass. at 68. Plaintiffs counsel suggests that NAF, although purporting to be a neutral arbitrator, is biased against consumers and in favor of large corporations. However, he does not expressly argue that the Agreement is substantively unconscionable because its promised neutrality is illusoiy. Cf. Bank One, N.A. v. Coates, 125 F.Sup.2d 819, 835-36 (S.D.Miss. 2001) (rejecting argument that arbitration agreement was unconscionable because designated arbitrator, NAF, was biased in favor of banking institutions); Carraway v. Beverly Enterprises Alabama, Inc., 978 So.2d 27, 32-33 (Ala. 2007) (rejecting argument that nursing home arbitration agreement was unconscionable because use of NAF was grossly favorable to nursing home). But see Stewart & Assocs., Int'l, Inc. v. Quixar, Inc., 2006 U.S.Dist. LEXIS 97897 at *12-14 (W.D.Miss. 2006) (finding arbitration agreement unconscionable where designated arbitrator, JAMS, appeared to be biased in favor of Amway Corporation and against distributors).