NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

17-P-1533                                        Appeals Court

        PEOPLE'S UNITED BANK  vs.  B&B FIRE PROTECTION, INC.


                          No. 17-P-1533.

        Essex.      October 4, 2018. - January 2, 2019.

           Present:  Milkey, Desmond, & Wendlandt, JJ.



Loan.  Guaranty.  Agency, Ratification.  Practice, Civil,
      Attorney's fees, Judicial discretion.




        Civil action commenced in the Superior Court Department on
December 22, 2014.

        The case was heard by Joshua I. Wall, J., and a motion for
reconsideration was considered by him.


        Peter M. Ross for the defendant.
        Charles J. Domestico (Vincent M. Domestico also present)
for the plaintiff.


        MILKEY, J.  In 2014, EAB Elevator, Inc. (EAB Elevator), and

Barnes International, LLC (Barnes International), defaulted on

two loans they had received from plaintiff People's United Bank

(bank).  Seeking to collect on the loans, the bank brought this

action against EAB Elevator, Barnes International, their

principal, Andrew Barnes, and B&B Fire Protection, Inc. (B&B or company). What remains of the case is the bank's collection action against B&B based on that entity's having executed a guaranty of the loans.[1] B&B's defense was that it never properly authorized the guaranty. Following a two-day bench trial, a Superior Court judge ruled in the bank's favor after concluding that regardless of whether the guaranty initially had been executed with authority, B&B effectively had ratified it through its actions and inaction. For substantially the same reasons expressed by the judge in his thoughtful memorandum of decision, we affirm.

Background.[2] 1. <u>B&B's relationship with EAB Elevator and Barnes International</u>. B&B, formed in 2012 by Andrew Barnes and Daniel Berry, was a business that designed and installed fire sprinkler systems. Barnes and Berry had a family connection in that Berry was married to Barnes's first cousin. The two men had distinct roles at B&B. Barnes, who held a fifty-one percent ownership share, served as B&B's president and ran the business

---

[1] The other three original defendants defaulted and a separate and final judgment was entered against them pursuant to Mass. R. Civ. P. 54 (b), 365 Mass. 820 (1974), and Mass. R. Civ. P. 55 (b) (2), as amended, 463 Mass. 1401 (2012).

[2] Except for an isolated misstatement that was quite obviously a typographical error, B&B has not demonstrated that any of the judge's careful findings are clearly erroneous. The factual recitation that follows is drawn from those findings unless otherwise noted.

side of the enterprise. Berry, who owned the remaining forty-nine percent, ran the operations side, that is, he was the one who performed, or at least oversaw, the actual design, installation, and maintenance of the sprinkler systems. Although Berry nominally served as a B&B director and its treasurer and secretary, he was content to leave business decisions to Barnes. At no point did the company observe any corporate formalities; for example, there never were any board meetings or resolutions. Rather, B&B was run in practice as a partnership, with Barnes as the one in charge.

EAB Elevator was in the business of installing and maintaining elevator systems, and Barnes International was an affiliated company. Unlike B&B, both of these other entities were wholly owned by Barnes. However, their operations were intertwined with those of B&B, which allowed all three companies to take advantage of various mutual benefits, such as joint marketing opportunities. The three firms shared office space, equipment, and personnel, and B&B was marketed "as a Barnes International Company." Their finances were also enmeshed, with B&B directly receiving some of the monies lent to EAB Elevator, and B&B in turn making regular payments to Barnes International in the form of monthly management fees. At least initially, Berry was content with this arrangement.

2. The May 2013 loan. In May of 2013, the bank agreed to loan EAB Elevator $100,000 in the form of a credit line.[3] B&B executed a guaranty of that loan (the May 2013 loan). Berry was aware of the guaranty at the time and either affirmatively blessed it or at least made no objection.[4]

3. The falling out. By Thanksgiving of 2013, Berry had grown disaffected with Barnes's management of B&B. As he explained at trial, he had begun to believe that Barnes was skimming money from B&B for his own benefit. The two men had a falling out, and by mid-December, Berry either quit or was fired. Nevertheless, Berry retained his ownership interest in B&B and nominally remained a director and officer thereof.

4. The December 2013 loans. On Christmas Eve of 2013 (that is, after Berry had left the company as an employee), the bank executed two agreements to lend money to EAB Elevator and Barnes International. These loans (the December 2013 loans) are the subject of the current collection action. One loan, for $65,000, was to refinance an existing loan from a different bank. The other, for $200,000, had two components. One paid

---

[3] The president of the bank was an uncle of both Barnes and Berry's wife, a happenstance that may explain some of the informality that occurred.

[4] At trial, Berry maintained that he believed that the indebtedness that resulted from the May 2013 loan was for only $65,000. The judge did not address this particular issue in his findings, but nothing turns on it.

off the existing $100,000 indebtedness on the May 2013 loan to EAB Elevator (thus effectively serving as a refinancing of that debt). The other established an additional $100,000 line of credit that could be drawn from over time. B&B executed a separate corporate guaranty on these loans, and thereby nominally agreed to obligate itself on them. The guaranty was signed by B&B's general counsel, purportedly pursuant to a power of attorney executed by Barnes (who, at the time, was in Florida). Meanwhile, Berry, who continued to hold a forty-nine percent share of B&B, was not informed about the December 2013 loans, much less about B&B's agreeing to guarantee payment on them. The judge determined that "[t]he evidence compels the inference that Barnes intentionally kept Berry from knowing anything about the December 2013 [l]oans and the December 2013 [g]uaranty."

5. Berry takes over B&B. In January of 2014, Berry sought information about the finances of B&B but was rebuffed. The following month he commenced an action against Barnes in the Superior Court, and the record indicates that he was seeking dissolution of the company. Trial evidence showed that the action ended quickly in a settlement through which Berry agreed to buy out Barnes's interest in B&B, and thus himself take over sole ownership and control of the company. Berry entered into that settlement while taking a decidedly casual approach to

B&B's finances.  He remained unaware of the December 2013 loans and B&B's agreement to guarantee them.[5]

6.  Berry learns of the December 2013 loans.  At a lunch held on April 9, 2014, Barnes told Berry about the December 2013 loans and B&B's guaranty of them.  The following day, Berry sent an electronic mail message (e-mail) to the bank's loan officer requesting that disbursements on the letter of credit established by the loans be put on hold for the time being.[6]  The loan officer sent a brief reply e-mail that stated as follows:

> "We will need to meet and discuss your options.  Please note, that I cannot discuss anything associated with Barnes International.  Give me a call, or shoot me an email when you have a chance."

The following day, Berry called the loan officer and they spoke by telephone.  There is little in the trial record as to the details of that conversation.  Berry acknowledged that he never raised with the loan officer his current position that B&B's guaranty of the loans was unauthorized.  It was also uncontested

---

[5] As part of the settlement, Berry did extract Barnes's agreement to indemnify Berry for B&B's indebtedness to the bank (which Berry understood at the time to refer to the guaranty of the May 2013 loan, not knowing that that loan had been paid off).

[6] Specifically, in the e-mail, Berry stated:  "Until [Barnes] and I hash out the details of all this can you put a freeze on the line of credit or require a signature from both him and [me] before Money is drawn as it is my understanding it is attached to all three companies."  The trial evidence is less than clear as to how much money was disbursed after Berry sent the e-mail.

that the loan officer reiterated that he could not discuss the Barnes International financials with Berry.  In any event, at that point, both Berry and the bank let the matter drop.[7]  There were no further communications in the ensuing months between Berry and anyone at the bank with respect to the loans or B&B's guaranty.

Instead of taking action to repudiate the guaranty, Berry implemented a different approach toward distancing himself from B&B's potential obligations.  He formed a new company, Berry Fire Protection, to take over B&B's operations and assets, including its outstanding accounts receivable.  Thus, B&B at this point effectively went out of business, and Berry used the company's receivables to pay for Berry Fire Protection's expenses (as well as some personal expenses), instead of paying the bank.

7.  <u>The bank's collection action</u>.  Barnes International and EAB Elevator defaulted on the December 2013 loans as of August of 2014.  After the bank's efforts to collect the money from those companies and Barnes personally foundered,[8] the bank

---

[7] The judge found, "Berry testified, 'I hoped this would all go away because of the family dynamic.'"

[8] The record reflects that the bank made extensive efforts to try to pursue Barnes to no ultimate avail.  As of the date of trial, Barnes's whereabouts were unknown (although one witness expressed his belief that Barnes was likely somewhere in Las Vegas).

pursued its claim against B&B on the guaranty. In defense, B&B maintained that the guaranty was never authorized. The company argued that Barnes's directing it to enter into the guaranty without Berry's knowledge or consent presented an obvious conflict of interest that deprived Barnes of the power to authorize it on his own. At trial, B&B argued that the execution of the guaranty was a "conflict of interest transaction" governed by G. L. c. 156D, § 8.31, and that, as such, it could be "authorized, approved, or ratified" only through the three specific options laid out in that section (none of which, B&B argued, applied).[9]

In addition, B&B argued at trial -- albeit in passing -- that, in any event, it should not be liable for any loan monies disbursed after Berry specifically had requested in writing that the bank freeze such payments. In support of this argument, B&B pointed out that the guaranty document itself included a provision that allowed B&B to revoke the guaranty going forward if it did so in writing, among other requirements. See note 15, infra.

---

[9] B&B also argued that there was a separate authority problem related to the power of attorney. Specifically, B&B argued that the power of attorney in fact authorized the general counsel to sign for Barnes only in his personal capacity and that, in any event, it could not delegate to her Barnes's corporate authority without express board approval.

For its part, the bank did not contest that Barnes's directing that B&B execute a guaranty without Berry's knowledge presented an obvious conflict of interest. Nor did the bank press an argument that B&B entered into the guaranty with actual authority. Highlighting that B&B never observed any corporate formalities and that B&B entered into the May 2013 loan without corporate votes or resolutions, the bank did make some argument that the guaranty was executed with apparent authority. However, the bank's principal defense was that B&B effectively had ratified the guaranty by Berry's not repudiating it once he learned of its existence on April 9, 2014. According to the bank, B&B's failure to disavow the guaranty deprived the bank of the opportunity to take steps immediately to protect itself.

The judge's ruling. After making careful findings, the judge passed over the question whether the guaranty initially was executed with authority (actual or apparent). Instead, he relied on the bank's principal argument that B&B effectively had ratified the guaranty by not repudiating it once Berry had learned of it. The judge did not specifically address B&B's fallback argument that, in any event, it should not be liable for any disbursements made after Berry had requested a freeze on the line of credit. However, a close reading of the judge's memorandum of decision reveals his view that the loan officer acted properly in response to Berry's request, and that Berry

alone was to blame for dropping the ball.[10]  The judge entered judgment against B&B for $296,327.24, the full outstanding amount owed on the December 2013 loans.  The judge subsequently denied B&B's motion for reconsideration and -- as further explained below -- required B&B to pay one-half of the bank's attorney's fees in defending that motion.

Discussion.  1.  Ratification of guaranty.  As the judge ably observed, the case law long has recognized that a corporation can ratify an existing unauthorized agreement not only by its actions but by its inaction.  See, e.g., Linkage Corp. v. Trustees of Boston Univ., 425 Mass. 1, 18, cert. denied, 522 U.S. 1015 (1997) ("Where an agent lacks actual authority to agree on behalf of his principal, the principal may still be bound if the principal acquiesces in the agent's action, or fails promptly to disavow the unauthorized conduct after disclosure of material facts").  We agree with the judge

---

[10] The judge stated as follows:

"Berry did contact [the loan officer] of the Bank by email on April 10 and by phone on April 11.  Berry did not contest or repudiate B&B's obligation to the Bank.  Rather than sending documents [that Berry had requested], [the loan officer] suggested a meeting 'to discuss your options.'  Because Berry had not previously informed the Bank of the sale of B&B, [the loan officer] cannot be faulted for his insistence on a meeting.  Berry did not arrange a meeting.  Berry did not contact [the loan officer] again to request information or documents.  He chose not to pursue information from the Bank after his request was not immediately successful."

that once Berry learned of the existence of the guaranty, B&B had an obligation to repudiate the guaranty promptly or be held to its terms.[11]  Put differently, even if we assume that the guaranty was voidable at the point that Berry learned of it, Berry did nothing to exercise that right and instead "purposefully shut his eyes to means of information within his own possession and control, having only that knowledge which he care[d] to have."  Colony of Wellfleet, Inc. v. Harris, 71 Mass. App. Ct. 522, 529 (2008), quoting Perkins v. Rich, 11 Mass. App. Ct. 317, 322 (1981), S.C., 385 Mass. 1001 (1982).  Berry pursued the alternative strategy of draining B&B's assets into his newly formed company while the bank was deprived of the opportunity to take action to try to protect itself.  Under these

---

[11] We agree with the judge that at that point, Berry was in possession of all the material facts and that even if he remained ignorant of some of the details, he could not bury his head in the sand to avoid learning of those details.  See Colony of Wellfleet, Inc. v. Harris, 71 Mass. App. Ct. 522, 529 (2008), citing Perkins v. Rich, 11 Mass. App. Ct. 317, 322 (1981), S.C., 385 Mass. 1001 (1982).  In addition, we note that at the point Berry learned of the guaranty, he was B&B's sole shareholder and principal.  We see no impediment to imputing his actions and inaction to B&B notwithstanding the absence of formal corporate resolutions.  With Berry having been content to have B&B operate without any corporate formalities throughout its life, B&B cannot now raise such practices as a defense to its liability.  See Diamond v. Pappathanasi, 78 Mass. App. Ct. 77, 94-96 (2010) (where nonmanaging partner benefited for years from "loose arrangements through which the enterprises operated," judge properly applied equitable principles in limiting her relief in "after-the-fact" claims of breached fiduciary duties).

circumstances, we discern no error in the judge's conclusion that B&B ratified the guaranty after Berry learned of it.[12]

To the extent that B&B argues that the existing case law on ratification was abrogated by the 2003 enactment of G. L. c. 156D, § 8.31, we are unpersuaded. By its express terms, that statute recognizes that a "conflict of interest transaction" -- such as B&B's guaranty here[13] -- is not voidable solely because of the conflict of interest if it has been "authorized, approved, or ratified" by the company's disinterested directors or owners after they are apprised of it. G. L. c. 156D, § 8.31 (a). The judge determined that B&B ratified the guaranty after Berry learned of it, and hence there is no inconsistency between the judge's ruling and the terms of the statute. To be sure, in discussing what action will be sufficient to "authorize[], approve[], or ratif[y]" a conflict of interest transaction, the statute does refer to a "vote" by either the directors or

---

[12] It bears noting that $100,000 of the December 2013 loans went to refinance an existing loan on which B&B already was obligated as a guarantor. B&B has no argument that it should not be held liable to that extent.

[13] A "conflict of interest transaction" is defined as "a transaction with the corporation in which a director of the corporation has a material direct or indirect interest." G. L. c. 156D, § 8.31 (a). Because Barnes obviously benefited from his directing B&B to guarantee the loans made to EAB Elevator and Barnes International -- companies that he wholly owned -- B&B's execution of that guaranty unquestionably constitutes a conflict of interest transaction.

shareholders.  G. L. c. 156D, § 8.31 (c) & (d).  However, we interpret such references as drawing a road map on how companies can try to ensure that conflict of interest transactions properly have been "authorized, approved, or ratified," not as establishing a new edict that such authorization, approval, or ratification necessarily can be effected only through formal corporate action.  See generally Kerins v. Lima, 425 Mass. 108, 110 (1997), quoting Commercial Wharf E. Condominium Ass'n v. Waterfront Parking Corp., 407 Mass. 123, 129 (1990), S.C., 412 Mass. 309 (1992) ("a court 'will not presume that the Legislature intended . . . a radical change in the common law without a clear expression of such intent'").

We are left to consider B&B's fallback argument that it at least should be relieved of having to reimburse the bank for the amount that was disbursed after Berry asked that such disbursements temporarily be placed on hold.  We respectfully disagree with the judge's assessment that only Berry was to blame for the abbreviated nature of the discussions between him and the bank.  At various points in the process, the bank seems as keen as Berry to bury its own head in the sand.[14]  Nevertheless, we do not view B&B's request that the bank place a temporary hold on future loan disbursements as amounting to

---

[14] As the bank's counsel forthrightly acknowledged at trial, "no party was covered with glory."

formal notice to the bank that B&B sought to revoke its guaranty under the terms of that contract.[15]  Accordingly, we conclude that B&B has not presented a viable ground for the alternative relief it requests.

2.  Attorney's fees issues.  The judge found that when B&B filed a motion asking him to reconsider his memorandum of decision, it included a "blatantly misleading" quote from that decision.  Based on this conduct, the judge ordered B&B to pay one-half of the bank's legal fees in defending the motion for reconsideration.  B&B has not demonstrated that the judge's finding on this point was clearly erroneous or that the judge's imposition of the sanction constituted an abuse of discretion.  See Van Christo Advertising, Inc. v. M/A-COM/LCS, 426 Mass. 410, 416-417 (1998) (setting forth standards applicable to appellate review of sanctions imposed pursuant to Mass. R. Civ. P. 11, as

_____

[15] B&B suggests that because the bank never provided Berry with the loan-related documents that he requested in his April 10, 2014, e-mail, Berry was not made aware of the existence of the "duration of guaranty" provision, and thus was prevented from terminating the guaranty.  However, in that e-mail, Berry actually requested "copies of the [Federal Small Business Administration] loan paperwork" for B&B, and documents regarding the line of credit that was established by the December 2013 loans.  Berry's e-mail did not specifically request the guaranty agreement that B&B had executed (a document that one might expect to be in B&B's own files).  B&B does not appear to claim that a copy of the guaranty agreement it executed was missing from its own files, and there is, in any event, no evidence in the trial record to support such a claim.

amended, 456 Mass. 1401 [2010]).  We therefore affirm the order requiring payment of those fees.[16]

Conclusion.  The judgment entered on June 26, 2017, is affirmed.  The postjudgment order entered on August 16, 2017, is also affirmed.

So ordered.

---

[16] At the conclusion of its brief, the bank makes a one-sentence request for "an award of costs and its appellate attorneys' fees."  That request is unadorned by argument or citation, and we are left to speculate as to the legal grounds on which the bank relies.  An initial request for an award of appellate legal fees and costs included in a brief need not -- indeed, should not -- specify the amount of the requested fees, or the number of hours and hourly rates on which the request is based.  Those issues are properly the subject of the petition for fees that is to follow an order allowing fees.  See Fabre v. Walton, 441 Mass. 9, 10-11 (2004).  However, the case law long has established that where, as here, a request for appellate fees and costs fails to identify the legal grounds on which the award allegedly would be justified, that request does not rise to the level of adequate appellate argument contemplated by Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975), and therefore need not be entertained.  Gustin v. Gustin, 420 Mass. 854, 858 (1995).  Nor are valid grounds for an award of appellate fees otherwise apparent on the record before us.  We therefore deny the bank's request.  See id.  Finally, we note that the appellate rules themselves soon expressly will require that a request for an award of appellate fees shall include "a citation to the authority therefor."  Mass. R. A. P. 16 (a) (10), as amended, 481 Mass. 1630 (2018) (effective March 1, 2019).